Rebekah Schultheiss
OR Bar No. 121199
Law Offices of Rebekah Millard, LLC
P.O. Box 7582
Springfield, Oregon 97475
(707) 227-2401
rebekah@millardoffices.com
*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **TESSA BULZAN**,<br><br>*Plaintiff*,<br><br>v.<br><br>**HILLSBORO SCHOOL DISTRICT; HILLSBORO SCHOOL DISTRICT'S BOARD OF EDUCATION**,<br><br>*Defendants*. | Case No.: ______________<br><br>**COMPLAINT**<br><br>Violation of First and Fourteenth Amendment Rights (42 U.S.C. § 1983)<br>**Jury Trial Demanded** |

## INTRODUCTION

1. Mrs. Bulzan is a mother of five who homeschools her children because she believes that God calls her to do so. For Mrs. Bulzan, God is part of everything; He cannot be cordoned off into discrete areas of life. He permeates even mundane, everyday occurrences. Mrs. Bulzan instills that belief in her children through her chosen homeschooling materials and curricula.

2. Mrs. Bulzan's husband is a public employee, and homeschooling is expensive. So when she learned that her school district had a Homeschooling Partnership that would reimburse for educational materials and that offered in-

person learning opportunities to supplement home instruction, Mrs. Bulzan was excited.

3. She corresponded with the program's representative, who told her that she could use any curriculum—including a religious one—as part of the Homeschooling Partnership program. July 10, 2025 to December 15, 2025 Emails between Ms. Kellar and Mrs. Bulzan at 2. A true and correct copy of the email chain is attached as Exhibit A.

4. So Mrs. Bulzan chose to use a combination of Abeka and Classical Conversations for her homeschool instruction and to enroll her children in classes through Firmly Planted Hillsboro co-op. All three provide God-centered academic instruction. After enrollment, the District continued to have very little interaction with Mrs. Bulzan or her homeschooling program—providing next-to-no oversight for her instruction. That is until she submitted her expenses for reimbursement at the end of the first semester. Then things changed.

5. The District's school-level employees denied reimbursement for all Abeka and Classical Conversations curriculum and for Firmly Planted Hillsboro co-op fees "due to the Christian and biblical worldview that is taught" and the "Christian beliefs and themes [that] are integrated throughout core subject areas." January 13–29, 2026 Emails between Ms. Kellar, Principal Lawson, and Mrs. Bulzan at 1, 7. A true and correct copy of the email chain is attached as Exhibit B.

6. That decision was based on District and Oregon Department of Education policy that reimbursing Mrs. Bulzan's educational materials would "violate the Establishment Clause" because "public funds cannot be used for materials in which religious instruction is embedded in the core curriculum." Ex. B at 1.

7. Mrs. Bulzan raised the denial with the District's Superintendent's office, which responded and doubled down. Assistant Superintendent Andrea Neville told Mrs. Bulzan that the District had properly denied her curriculum reimbursement because Abeka "is developed from a religious perspective with a biblical worldview woven through the subjects," Classical Conversations "is intentional about being a Christian, faith-integrated curriculum" that "blends classical academic methods with a biblical worldview," and Firmly Planted Hillsboro "teach[es] every subject through a Biblical worldview." Step 2 Report Following the Investigation of a Discrimination Complaint from Assistant Superintendent Andrea Neville at 2. A true and correct copy of the report is attached as Exhibit C.

8. The District would not reimburse curricula that "embed[ded] religious perspectives into the curriculum materials." Ex. C at 2. She confirmed again that this was District policy, at the direction of the Oregon Department of Education.

9. Mrs. Bulzan's curricula more than satisfied Oregon's academic standards—it exceeded them. And she knew that it was wrong that she could not be reimbursed simply because they included a religious worldview. She challenged the decision all the way through the District's complaint process, highlighting recent Supreme Court cases holding that exclusions from generally available benefits because of religious character "'penalize[] the free exercise' of religion" and are "odious to our Constitution." *Carson v. Makin*, 596 U.S. 767, 779–80 (2022) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462, 467 (2017)); *Espinoza v. Mo. Dep't of Revenue*, 591 U.S. 464, 476, 489 (2020) (quoting *Trinity Lutheran*, 582 U.S. at 467); *see* April 28, 2026 Email to Board from Mrs. Bulzan (citing *Carson*); February 24, 2026 Written Appeal to the Board from Mrs. Bulzan (citing *Carson* and *Espinoza*). A true and correct copy of the April 28, 2026 email is

attached as Exhibit D, and a true and correct copy of the February 24, 2026 written appeal is attached as Exhibit E. But the District would not budge.

10. By discriminating against Mrs. Bulzan's choice to use religious educational materials for her children, the District violated Mrs. Bulzan's constitutional rights under both the First and Fourteenth Amendments. She thus brings this civil-rights lawsuit for damages and injunctive and declaratory relief.

**PARTIES**

11. Plaintiff Tessa Bulzan has five children between the ages of 10 months and 8 years.

12. Mrs. Bulzan, her husband, and her children are residents of Hillsboro, Oregon and live within the geographic boundaries served by the Hillsboro School District (the District or HSD)'s schools.

13. The District is a "common school" mandated by Oregon's Constitution. HSD Board of Directors Policy BB (rev. Jan. 22, 2019), https://perma.cc/764E-DMA7; Or. Const., art. VIII, § 3.

14. The District operates 37 schools, including Hillsboro Online Academy and Groner Elementary School.

15. Hillsboro School District's Homeschool Partnership (HSDHP) is a "program within Hillsboro Online Academy" and offers optional in-person classes, such as music or PE, at Groner Elementary School. HSD's Homeschool Partnership, https://perma.cc/A2EW-4QMC.

16. The District is a "bod[y] corporate," Or. Rev. Stat. Ann. § 332.072, and is thus capable of suing or being sued.

17. Defendant Hillsboro School District's Board of Education (the Board) "is the governing body of the Hillsboro School District." HSD Board of Directors Policy BB (rev. Jan. 22, 2019), https://perma.cc/764E-DMA7.

18. The Board is "authorized to transact all business coming within the jurisdiction of the district and to sue and be sued." Or. Rev. Stat. Ann. § 332.072.

19. The District and the Board are political subdivisions of the State of Oregon.

## JURISDICTION AND VENUE

20. This civil-rights action raises federal questions under the U.S. Constitution, namely its First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

21. This Court has original subject-matter jurisdiction over this action. 28 U.S.C. §§ 1331, 1343.

22. Venue is proper in the Portland Division of the United States District Court for the District of Oregon because the parties reside in this Division, 28 U.S.C. § 1391(b)(1), (c)(2); LR 3-2(a); and because the events giving rise to Mrs. Bulzan's claims occurred within this Division, 28 U.S.C. § 1391(b)(2); LR 3-2(b). *See* 28 U.S.C. § 117.

23. Those same facts grant this Court personal jurisdiction over Defendants. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068–69 (9th Cir. 2015).

24. This Court has authority to award declaratory relief, 28 U.S.C. § 2201–02, Fed. R. Civ. P. 57; injunctive relief, 28 U.S.C. § 1343, Fed. R. Civ. P. 65; damages, 28 U.S.C. § 1343; and reasonable costs and attorneys' fees, 42 U.S.C. § 1988, Fed. R. Civ. P. 54.

## FACTUAL BACKGROUND

### I. Mrs. Bulzan began homeschooling in 2022.

25. In 2022, Mrs. Bulzan's oldest child started school.

26. Mrs. Bulzan and her husband originally enrolled their daughter in a private Christian school, but even at that school, their daughter was being taught values that did not align with Mrs. Bulzan's religious beliefs.

27. Mrs. Bulzan felt called to homeschool, but she was nervous.

28. She was concerned about her teaching ability. Because of undiagnosed dyslexia, Mrs. Bulzan had not read until she was ten-years-old.

29. Only after Mrs. Bulzan joined the Marines was she diagnosed with dyslexia and provided treatment. After treatment, she earned her MBA from Duke University with a specialization in data science. Then, Nike hired Mrs. Bulzan to manage their Asia-Pacific and Latin America marketplace orders.

30. She and her husband knew that sacrificing her corporate salary and living on only her husband's government salary would be a challenge.

31. Still, Mrs. Bulzan knew that she had to raise her children to know and love God and truth. She believed that God would provide financially and grant her the ability to teach her children if she followed His call. So she pulled her daughter out of the private school, her husband built her a classroom in their home, and Mrs. Bulzan began homeschooling.

32. Given her concerns, she began researching homeschool curricula, looking for something that was structured and user-friendly.

33. She searched for homeschool curricula that reflected that belief and incorporated God into academic lessons. God was the entire reason she was homeschooling, and for her, everything is God-centered; He is a pivotal part of existence and cannot be separated from any facet of life.

34. Mrs. Bulzan's daughter has been diagnosed with dyslexia.

35. Cursive writing programs are helpful for children with dyslexia. So it was important for Mrs. Bulzan to find a curriculum that included cursive.

36. Her research led her to the Abeka curriculum.

37. Abeka is a homeschooling curriculum that helps "homeschooling parents ... provide an excellent education from a Christian perspective." https://perma.cc/B9RN-LB9W. Abeka's "mission is to support students ... and parents by providing ... academic resources based upon biblical values." *Id.* In short, Abeka offers "comprehensive, quality curriculum and materials written from a Christian perspective." *Id.*

38. Mrs. Bulzan chose Abeka as her core curriculum because of its God-centered perspective, structured and proven methods and materials, and stellar cursive program.

39. As Mrs. Bulzan continued homeschooling and became more familiar with available opportunities, she learned about Classical Conversations and the Firmly Planted Hillsboro co-op.

40. Classical Conversations is a "Christ-centered homeschool curriculum" done "with a local community of like-minded families." https://perma.cc/KTC2-JFX6. It "equip[s]" parents with "the tools and support to teach a Christ-centered worldview that's rooted in the classical model" and provides a "comprehensive, Christian education" designed to "create[] a lifelong love of learning" and "cultivate an inquisitive, thoughtful child through an intentional, community-based approach." *Id.*

41. Classical Conversations is effective. Students do significantly better on college-entrance exams than the national average. https://perma.cc/U75H-6QQP.

42. Mrs. Bulzan incorporated Classical Conversations into her homeschool because of its God-centered materials, group setting, and record of great academic achievement.

43. She also chose to include Firmly Planted Hillsboro co-op classes in her homeschool. This co-op is a "Christ-centered homeschooling co-op" in Hillsboro, Oregon. https://perma.cc/7DBT-R3Z9. It was created "for academic enrichment . . . spiritual growth, accountability, and genuine community rooted in the Gospel." *Id.* The program supports families "in raising children rooted in Biblical truth, strong character, and academic excellence through parent-led, God-honoring education" and focuses on "grow[ing] together [] in faith, in wisdom, and in love." *Id.*

44. Mrs. Bulzan chose to place her children in some classes at Firmly Planted Hillsboro because of its Christian values and opportunities to take different lessons—such as music theory and a science-experiments lab—with other children.

## II. Mrs. Bulzan enrolled in the District's Homeschool Partnership program.

45. In July 2025, Mrs. Bulzan enrolled two of her children in HSDHP for the upcoming school year.

46. One child started kindergarten.

47. The other child entered second grade.

48. HSDHP is "a program within Hillsboro Online Academy." HSD Homeschool Partnership, https://perma.cc/A2EW-4QMC.

49. It provides a "curriculum allowance" of $2,000 per child per year as well as a "tech stipend." HSD Homeschool Partnership: Curriculum Allowance, https://perma.cc/WL89-ZQ2U.

50. HSDHP also offers "[o]ptional in-person and virtual clubs and classes." HSD Homeschool Partnership: Clubs and Classes, https://perma.cc/52KK-LCU2.

51. Mrs. Bulzan chose to participate in HSDHP because homeschooling is expensive and it is challenging to raise and educate a family on one income—a necessity because Mrs. Bulzan homeschools.

52. Additionally, Mrs. Bulzan's tax dollars help fund the program, and she wanted to receive the benefit that her taxes make possible.

53. Mrs. Bulzan preferred HSDHP over other programs because it is in her community and has the option of doing in-person activities and learning.

54. HSDHP has expanded the in-person opportunities for the upcoming year, and Mrs. Bulzan plans to take advantage of those opportunities.

### III. HSDHP did not restrict, direct, or participate in Mrs. Bulzan's homeschool instruction.

55. HSDHP exists "to empower families in creating personalized, meaningful education." HSD Homeschool Partnership, https://perma.cc/A2EW-4QMC.

56. Through HSDHP, families have "the freedom to use [their] homeschool curriculum materials to provide individualized, parent-taught academic instruction at home." HSD Homeschool Partnership, https://perma.cc/A2EW-4QMC.

57. This was confirmed in Mrs. Bulzan's interactions with District employees when she signed up for the program and after.

58. For example, as part of the program, Mrs. Bulzan interacted with Ms. Margaret Kellar, who administers HSDHP. Before the 2025-2026 school year started, Ms. Kellar assured Mrs. Bulzan that she could "use any curriculum," even a religious one, as an HSDHP participant. Ex. A at 2. But she did mention that the material had to be "non-religious to qualify for reimbursement." *Id.*

59. Later in the year, the District refused to reimburse any amount for Mrs. Bulzan's Abeka and Classical Conversations curricula or for her Firmly Planted Hillsboro costs. Ex. B.

60. After the District denied those reimbursements, Ms. Kellar confirmed that religious curricula could be used as part of the program—saying "I *am* able to

accept religious curriculum as work samples and families are absolutely welcome to use it in their schooling." Ex. B at 5.

61. When Mrs. Bulzan appealed the reimbursement denial, the Hillsboro Online Academy principal, Shannon Lawson, and District Assistant Superintendent Andrea Neville weighed in similarly.

62. Ms. Lawson told Mrs. Bulzan that the curriculum was the family's and could be religious: "[f]amilies may use religious curriculum as part of their homeschooling program" while participating in HSDHP. Ex. B at 1.

63. Ms. Neville said HSDHP participants could choose their own curriculum based on their "religious beliefs" and were free in "what choices they use for curriculum . . . for their child for the purpose of homeschooling." Ex. C at 3.

64. Apart from reimbursement decisions—and consistent with its policy—the District did not assess or approve Mrs. Bulzan's educational materials or methods before she entered HSDHP, or as part of her ongoing involvement in the program.

65. For the 2025-2026 school year, HSDHP did not require any agreement—written or otherwise—about Mrs. Bulzan's curriculum or teaching methods.

66. For the 2025-2026 school year, Mrs. Bulzan was not asked to sign any agreement or contract to participate in HSDHP.

67. HSDHP also did not require as a prerequisite to participation that Mrs. Bulzan's curriculum be aligned with any state or local content standards distinct from those applicable to homeschooling families not involved in the program.

68. Mrs. Bulzan alone selected the study methods and materials that she used to educate her children.

69. While participating in HSDHP, Mrs. Bulzan's children did not take any state assessments or participate in any state testing.

70. No one in the District supervised Mrs. Bulzan's homeschool or pre-approved her curriculum.

71. To participate in HSDHP, the District required just two things of Mrs. Bulzan.

72. One, the District required Mrs. Bulzan to log into an app each day she taught homeschool and "like" a message to confirm that she taught that day.

73. Two, the District required Mrs. Bulzan to submit quarterly work samples for certain subjects—which could be religious—and Ms. Kellar met with her once at the beginning of the year to discuss the first work samples and answer any questions.

74. The District had no input into or control over Mrs. Bulzan's curriculum as part of the HSDHP program.

75. The District did not otherwise have input into or control over Mrs. Bulzan's curriculum.

76. No District employee ever provided direct instruction to Mrs. Bulzan's children as part of the program.

77. No District employee otherwise provided direct instruction to Mrs. Bulzan's children.

78. No District employee even met Mrs. Bulzan's children as part of HSDHP.

## IV. The District allows reimbursement for a wide variety of non-religious educational materials and instruction.

79. Through HSDHP, the District reimburses for materials or lessons provided by dozens of third parties.

80. Those third parties include companies that create and sell curricula or other educational materials.

81. They also include private individuals or businesses that provide various lessons, such as golf, piano, and swim team.

82. These reimbursements happen only after an individual family chooses to use the materials or attend the lessons and then requests reimbursement.

83. Through HSDHP, the District reimburses materials and experiences that promote a wide range of worldviews, including instruction that contradicts Christian beliefs and instruction with other spiritual themes.

84. For instance, for second grade, the District reimburses a book titled: "Julian Is A Mermaid."

85. In that book, a young boy dresses in drag as a mermaid and tells his grandmother that he is a mermaid.

86. The grandmother affirms that he is a mermaid and encourages him by giving him a necklace to wear and taking him to a parade that includes other men dressed in drag.

87. For kindergarten, the District reimburses a book titled: "We Are Water Protectors."

88. In that book, a young indigenous girl explains that "[w]ater is sacred" and talks about a duty to "Mother Earth."

89. The girl declares that "[w]ater has its own spirit" and discusses a prophecy of her ancestors.

90. The author's and illustrator's notes explain that the book is about "the sacred relationship between humanity and all living things" and "protecting our sacred Mother Earth."

91. The illustrator attempts to convey that "the spirit of mni wiconi runs through our veins."

92. And the book concludes with an "earth steward and water protector pledge" to "honor Mother Earth" and to "always remember to treat the Earth as I would like to be treated."

## V. The District refused to reimburse Mrs. Bulzan's homeschooling materials and expenses solely because of their "Christian and biblical worldview."

93. Shortly after joining HSDHP, Ms. Kellar—the HSDHP administrator—told Mrs. Bulzan that her curriculum had to be "non-religious to qualify for reimbursement." Ex. A at 2.

94. During orientation, Mrs. Bulzan asked for clarification on what would be considered "religious" such that it would not qualify for reimbursement. She specifically raised her curricula. She explained that she used them primarily to teach academic subjects but that they did discuss God and use Scripture at times.

95. Ms. Kellar stated that she would have to see the curricula and make a decision on a case-by-case basis. But she implied that as long as the curricula were not for Bible class and were predominantly academic, she thought they would be reimbursable.

96. Ms. Kellar also told Mrs. Bulzan that tutoring and outdoor school programs could be reimbursed "[a]s long as they are not faith-based." Ex. A at 1.

97. At the end of the first semester, Mrs. Bulzan submitted reimbursement requests for both children for costs associated with Math-U-See, Abeka, Classical Conversations, and Firmly Planted Hillsboro.

98. For her son, she also submitted reimbursement requests for some swim-team fees.

99. This was in accord with the HSDHP schedule.

100. HSDHP only reimbursed for the Math-U-See materials and the swimming dues. Ex. B at 5, 7.

101. Mrs. Bulzan submitted reimbursement for the portions of Abeka and Classical Conversations that covered core academic subjects—based on the Oregon academic standards—such as language arts, math, history, and science.

102. Mrs. Bulzan's instruction and materials met (and in many cases exceeded) Oregon academic standards in core subjects. Some (but not all) of the lessons and worksheets also referenced God and the Bible.

103. For example, one worksheet from the Abeka curriculum asked the second grader to choose the correct word in six sentences. One sentence was "The Bible is the Word of God." The other five sentences did not mention religion. All six sentences strengthened the student's reading skills.

104. That second-grade Phonics and Language book covers topics such as "declarative and interrogative sentences," "contractions," "adjectives," "adverbs," "subjects and predicates in sentences," and much more.

105. The materials are academically appropriate and assist the students in meeting educational milestones.

106. The Abeka Writing with Phonics K4/K5 book meets multiple Oregon English Language Arts and Literacy Standards for foundational reading skills and language in kindergarten, including "[d]emonstrate understanding of spoken words, syllables, and phonemes"; "[k]now and apply grade-level phonics and word analysis skills in decoding and encoding words"; and "[d]emonstrate command of the conventions of standard English grammar and usage when writing or speaking," among others. K-12 Oregon English Language Arts and Literacy Standards, https://perma.cc/NRL6-64UL.

107. The Abeka Letters and Sounds K5 book also meets multiple Oregon English Language Arts and Literacy Standards for foundational reading skills and language in kindergarten, including "[b]lend and segment the individual phonemes of single-syllable spoken words"; "[b]lend and segment the onsets and rimes of single-syllable spoken words"; and "[i]solate and pronounce the initial, medial vowel, and final phonemes in three-phoneme words," among others. K-12 Oregon English Language Arts and Literacy Standards, https://perma.cc/NRL6-64UL.

108. The Abeka Phonics and Language 2 book meets multiple Oregon English Language Arts and Literacy Standards for foundational reading skills and language in second grade, including "[k]now and apply grade-level phonics and word analysis skills in decoding and encoding words"; "[d]istinguish long and short vowels when reading regularly spelled one-syllable words"; "[r]ecognize and read irregularly spelled words"; "[d]emonstrate command of the conventions of standard English grammar and usage when writing or speaking"; and "[d]emonstrate command of the conventions of standard English capitalization, punctuation, and spelling when writing," among others. K-12 Oregon English Language Arts and Literacy Standards, https://perma.cc/NRL6-64UL.

109. The Abeka Spelling and Poetry 2 book meets multiple Oregon English Language Arts and Literacy Standards for foundational reading skills and language in second grade, including "[r]ead grade-level text with fluency (accuracy, rate, prosody) to support comprehension"; "[g]eneralize spelling patterns"; and "[c]onsult reference materials, including beginning dictionaries, both print and digital, as needed to check and correct spellings," among others. K-12 Oregon English Language Arts and Literacy Standards, https://perma.cc/NRL6-64UL.

110. Likewise, Classical Conversations' curriculum meets multiple Oregon Academic Standards for second grade. As non-exhaustive examples, it requires

weekly oral presentations that meet the core standard: "[t]ell a story or recount an experience with appropriate facts and relevant, descriptive details, speaking audibly in coherent sentences"; it has a grammar portion that meets the core standard: "[u]se knowledge of language and its conventions when writing, speaking, reading, or listening"; it uses a timeline song with over 160 events that meets the core standard: "[u]se chronological time to distinguish between events that happened in the recent and distant past"; and it does a weekly map pinning of European, Asian, and African landmarks that meets the core standard: "[u]tilize maps and globes to investigate and identify the world's physical geography." K-12 Oregon English Language Arts and Literacy Standards, https://perma.cc/NRL6-64UL; 2024 Oregon Social Science Standards, https://perma.cc/89J5-S68G.

111. Classical Conversations' curriculum also meets multiple Oregon Academic Standards for kindergarten. As non-exhaustive examples, it requires weekly memorization and recitation of the eight parts of speech, pronouns, adverbs, and conjunctions, which meet the core standard: "[d]emonstrate command of the conventions of standard English grammar and usage when writing or speaking"; it requires identification of countries, rivers, and bodies of water, which meets the core standard: "[i]dentify, compare, and contrast pictures, maps, and globes"; it teaches skip counting, which meets the core standard: "[o]rally count to 100 by ones and by tens in sequential order"; students learn about the law of motion, which meets the core standard: "[p]lan and conduct an investigation to compare the effects of different strengths or different directions of pushes and pulls on the motion of an object"; and it requires weekly oral presentations, which fulfills the core standard: "[s]peak audibly and express thoughts, feelings, and ideas clearly." K-12 Oregon English Language Arts and Literacy Standards, https://perma.cc/NRL6-64UL; 2024 Oregon Social Science Standards, https://perma.cc/89J5-S68G; K-12 Science

Standards, https://perma.cc/4FYG-J59Z; 2021 Oregon Mathematics Standards, https://perma.cc/522H-FMKE.

112. These materials and instruction are academic tools designed to meet academic goals.

113. These materials are illustrative of Abeka and Classical Conversations for other grade levels.

114. The District never disputed the academic value of Mrs. Bulzan's curriculum in any of its correspondence with her.

115. Yet, despite their academic value, when Mrs. Bulzan submitted her receipts at the end of the first semester, the District refused to reimburse her because it deemed the materials "religious."

116. Concerning the Classical Conversations and Firmly Planted Hillsboro fees, the District said that "[s]tate funds are not allowed to go toward religious curriculum or fees toward participation in religious groups." Ex. B at 7.

117. For Abeka, the District refused reimbursement only "due to the Christian and biblical worldview that is taught." Ex. B at 7.

118. When Mrs. Bulzan learned that her reimbursement requests were rejected, she contacted the District. Mrs. Bulzan told the HSDHP administrator, Ms. Kellar, that she "anticipated more of [her] curriculum being paid for" and explained that she was now in a "financial pinch." Ex. B at 6.

119. She attached examples of the worksheets and projects used in Abeka and how Classical Conversations "mapp[ed] to OR standards" "in hopes they could meet the requirement for reimbursement." Ex. B at 6.

120. Abeka or Classical Conversations materials and worksheets often contain no religious references. *See* Work Samples from the Abeka and Classical

Conversations curricula. A true and correct copy of those examples has been attached as Exhibit F.

121. But the District would not reimburse for any of the curriculum. Instead, it refused to reimburse any portion of the curricula's cost because a "Christian and biblical worldview" undergirded the curriculum.

122. When pressed, Ms. Kellar reiterated: "state funds cannot be used to pay for religious curriculum." Ex. B at 5.

123. The state would reimburse for similar, non-religious curricula.

124. For example, Mrs. Bulzan used Abeka's cursive curriculum.

125. The District refused to reimburse for that curriculum.

126. But Ms. Kellar told Mrs. Bulzan that if she found "a secular cursive curriculum similar to Abeka," Ms. Kellar would "add it to the list" of curricula approved for reimbursement and "recommend [it] to others." Ex. A at 1.

127. The list of curricula approved for reimbursement includes many curricula that teach similar concepts in similar ways to Mrs. Bulzan's curricula. A true and correct copy of the list of reimbursement-approved curricula is attached as Exhibit G.

128. But the approved curricula do it from a non-religious standpoint.

## VI. Mrs. Bulzan challenged the District's religious discrimination, and the District doubled down, enforcing the District's and Oregon Department of Education's unconstitutional policies and practices.

129. Mrs. Bulzan then challenged the reimbursement refusal through the District's four-step discrimination-complaint process.

130. District and HSDHP staff repeatedly declined Mrs. Bulzan's reimbursement based only on the religious character of her homeschooling curriculum. This was true throughout the discrimination-complaint process.

131. District staff also repeatedly tied their reimbursement denial to ODE's policies and procedures.

132. Even before Step One of the discrimination-complaint process, Ms. Kellar told Mrs. Bulzan that she "reached out" to ODE, and ODE was "very clear that any school receiving state funds—whether charter or public—cannot pay for religious curriculum." Ex. B at 5.

133. Ms. Kellar said her "hands [were] truly tied in this area" by ODE's policy. Ex. B at 5.

### A. Step One of the Discrimination-Complaint Process

134. At Step One of the discrimination-complaint process, Mrs. Bulzan filed an official discrimination complaint, explaining how HSDHP had discriminated against her based on her religion when it denied reimbursement based solely on the materials' religious content.

135. She explained that her children were using the curriculum to meet "state educational milestones" and provided examples of how the curricula achieved those goals. Ex. B at 4.

136. She also went and spoke at the Board meeting and provided similar examples of Abeka and Classical Conversations materials that both met the Oregon requirements and did not mention God or religion.

137. For example, she provided several second-grade and kindergarten phonics worksheets from Abeka, none of which contained anything overtly religious. She provided Classical Conversations work, where her daughter had drawn a map of Baltic Europe and Western Europe and worksheets where her daughter had labeled the planets and the parts of the sun and her son had listed the phases of the moon and non-planet bodies in the solar-system.

138. A couple of weeks later, the principal of Hillsboro Online Academy, Shannon Lawson, which oversees HSDHP, acknowledged receipt of Mrs. Bulzan's discrimination complaint. She told Mrs. Bulzan that the District was "following the instructions given to [it] by the Oregon Department of Education." Ex. B at 2. She also informed Mrs. Bulzan that she had sent her discrimination complaint "to ODE for review" and that she would respond to the complaint formally after she "heard from them." *Id.*

139. A few days later, she affirmed the reimbursement refusal, stating that "[a]fter consultation with the Oregon Department of Education and district administration," reimbursing those materials and instructional fees would "violate the Establishment Clause" and "the Oregon Constitution." Ex. B at 1.

140. Ms. Lawson made clear that the reimbursement denial was "based on the instructional content of the materials" and that reimbursement could be approved if there were a "version[] of the[] curriculum that remove[d] religious instruction." Ex. B at 1.

141. Ms. Lawson then explained that "the Abeka curriculum [has] Christian beliefs and themes [that] are integrated throughout core subject areas" and only "[m]aterials that align with Oregon academic standards and do not include religious instruction are allowable for reimbursement." Ex. B at 1.

142. Ms. Lawson concluded: "[P]ublic funds cannot be used for materials in which religious instruction is embedded in the core curriculum." Ex. B at 1.

143. The only reason Mrs. Bulzan was denied reimbursement for these materials was their religious nature.

**B. Step Two of the Discrimination-Complaint Process**

144. Mrs. Bulzan then proceeded to Step Two of the discrimination-complaint process, appealing the principal's decision to the District's Superintendent's Office.

145. Even before Mrs. Bulzan filed her Step-Two appeal, Assistant Superintendent Andrea Neville emailed ODE, explaining the reimbursement refusal and the Step One challenge.

146. ODE confirmed that it had been in touch with the District about the issue and stated that the District's position "echoe[d] ODE's response." February 5–19, 2026 Emails between Oregon Department of Education, Assistant Superintendent Neville, and Mrs. Bulzan at 1. A true and correct copy of that email chain is attached as Exhibit H.

147. Ms. Neville also raised concerns about a rumor that another school district was "reimbursing religious curriculum and materials." Ex. H at 2.

148. She said that she "truly hoped" that information was "not accurate" because she was "concerned" about "using taxpayers' dollars for reimbursement of religious based curriculum." Ex. H at 2.

149. And she threatened that if it were true, "it warrant[ed] a conversation of use of state funds in their program." Ex. H at 2.

150. Once Mrs. Bulzan submitted her Step Two appeal, Ms. Neville responded and informed her that the District would "be reaching out to ODE . . . as we follow guidance in this area from them." Ex. H at 3.

151. Then Ms. Neville reached out to ODE again to confirm its policy on reimbursements for religious materials. In that email, she reiterated that "the Homeschool Liaison at ODE . . . and legal counsel [] both told [the District] that [its] denial was accurate." Ex. H at 7.

152. She also complained about having to respond to Mrs. Bulzan's complaint because the materials were "clearly religious in nature," and she did "not see this particular complaint as meeting the threshold for a full process." Ex. H at 7.

153. She chastised the ODE complaint and appeal specialist for "sending [Mrs. Bulzan] detailed steps to launch a discrimination complaint" when Mrs. Bulzan contacted her. Ex. H at 7.

154. She then "request[ed] that ODE support the HSD response rather than expect [the District] to move through multiple steps in the discrimination complaint process." Ex. H at 7–8.

155. ODE explained that the complaint process was "required." Ex. H at 6.

156. Ms. Neville then responded formally to Mrs. Bulzan's Step Two submission. She first asserted that it was "clearly stated on the website and in presentations that families can be reimbursed for approved, **non-religious** curriculum, extracurricular activities, and school supplies." Ex. C at 2.

157. She then described each of the requested reimbursements.

158. She said that "*Abeka*'s curriculum is developed from a religious perspective with a biblical worldview woven through the subjects. It uses Scripture and Christian principles to explain topics in many areas, including history, science, and sometimes even math." Ex. C at 2.

159. She said that "*Classical Conversations* is also intentional about being a Christian, faith-integrated curriculum. It's not secular in the way programs designed without religious positioning are; instead it blends classical academic methods with a biblical worldview throughout its materials." Ex. C at 2.

160. She stated that *Firmly Planted Hillsboro* was an elective opportunity "focused on teaching every subject through a Biblical worldview—integrating

Scripture, prayer, and Christian values into both academics and community life." Ex. C at 2.

161. Ms. Neville made clear it would reimburse curricula that did not "embed[] religious perspectives into the curriculum materials" and "in which religious instruction is **not** part of the curriculum itself." Ex. C at 2.

162. She concluded that the reimbursement refusal should stand because the District could "not financially support religious activity." Ex. C at 3.

163. Importantly, she made clear that the District would not reimburse any of the curriculum or co-op fees, even though portions did not mention God or religion, refusing to reimburse any portion of the curriculum or co-op costs because of the "religious perspective," "biblical worldview," and "Christian values" "embedded" into the curriculum and co-op classes.

164. The Step Two report noted the District's consultation with ODE numerous times.

**C. Step Three of the Discrimination-Complaint Process**

165. Mrs. Bulzan then proceeded to Step Three of the discrimination-complaint process.

166. She highlighted recent Supreme Court cases holding that exclusions from generally available benefits because of religious character "'penalize[] the free exercise' of religion" and are "odious to our Constitution." *Carson v. Makin*, 596 U.S. 767, 779–80 (2022) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462, 467 (2017)); *Espinoza v. Mo. Dep't of Revenue*, 591 U.S. 464, 476, 489 (2020) (quoting *Trinity Lutheran*, 582 U.S. at 467); Ex. E (citing *Carson* and *Espinoza*).

167. That written challenge was shared with the Board. February 27, 2026 Email between Assistant Superintendent Neville and Mrs. Bulzan. A true and correct copy of the email is attached as Exhibit I.

168. There, the District hired an outside law firm that issued a report.

169. The Step Three report summarized the earlier proceedings and upheld the refusal to reimburse Mrs. Bulzan's religious materials.

170. It emphasized that the District had consulted with ODE and was following ODE's instructions.

**D. Step Four of the Discrimination-Complaint Process**

171. Mrs. Bulzan attempted to file her Step Four appeal to the Board.

172. She again emphasized a recent Supreme Court case holding that exclusions from generally available benefits because of religious character "'penalize[] the free exercise' of religion" and are "odious to our Constitution." *Carson*, 596 U.S. at 779–80 (quoting *Trinity Lutheran*, 582 U.S. at 462, 467); Ex. D (citing *Carson*).

173. She also spoke at the Board meeting and submitted a written challenge to the religiously based reimbursement denials.

174. She even provided examples of worksheets and other educational materials that met Oregon educational standards and did not mention God.

175. But the discrimination-complaint process only allowed five days to appeal the Step-Three decision, and Mrs. Bulzan's appeal was outside that five-day window.

176. The Board never responded, just as it had not responded when she raised her concerns at an earlier Board meeting.

177. After the Board failed to respond, Ms. Neville stated in an email that because Mrs. Bulzan was "beyond the appeal window . . . the decision rendered at

Step 3 is considered the final decision of the District." May 1, 2026 Email between Assistant Superintendent Neville and Mrs. Bulzan. A true and correct copy of that email is attached as Exhibit J.

178. Shortly after that email, an Oregon Department of Education (ODE) representative confirmed that Mrs. Bulzan had "exhausted the Hillsboro School District's discrimination complaint process and received a final decision." May 1, 2026 Email between ODE's Civil Rights Support Specialist and Mrs. Bulzan. A true and correct copy of that email is attached as Exhibit K.

179. After the District had repeatedly denied Mrs. Bulzan reimbursement for her religious curricula and materials, she submitted reimbursement for her daughter's piano lessons and for some additional swim-team costs.

180. But Mrs. Bulzan still did not receive the full reimbursement benefit for either child.

## VII. The District plans to continue violating Mrs. Bulzan's constitutional rights.

181. Mrs. Bulzan's children are enrolled in HSDHP for the 2026-2027 school year.

182. Mrs. Bulzan chose to stay in the program so that her children could take part in some of the in-person learning opportunities.

183. She also wants access to the reimbursements available to other homeschool families and funded by her tax dollars.

184. Mrs. Bulzan feels that she should not be forced to forgo HSDHP's benefits simply because her homeschool instills her deeply held religious beliefs in her children.

185. But the District still expressly refuses to reimburse religious curriculum as part of its HSDHP program.

186. The HSDHP website emphasizes at least three times that the curriculum allowance can be used for "non-religious" curriculum and extracurricular activities. HSD Homeschool Partnership, https://perma.cc/A2EW-4QMC; HSD Homeschool Partnership: Curriculum Allowance, https://perma.cc/WL89-ZQ2U.

187. In HSDHP's orientation meeting for the 2026-2027 school year, the District stated that parents could "use [their] curriculum allowance on (secular) non-religious homeschool curriculum, school supplies, and extracurriculars."

188. The day after the orientation meeting, parents went to the school to pick up tech equipment for their children.

189. While there, they were handed a two-page "agreement" and told that they had to sign it for the 2026-2027 school year.

190. Signing the agreement was not a requirement to enroll and was never mentioned before the tech-pickup day.

191. On tech-pickup day, the parents were told that at tech-pickup they would sign an agreement to confirm that they had attended an orientation.

192. The agreement stated: "This agreement outlines the expectations and requirements for participation in the Homeschool Partnership (HP) Program." HSDHP Family Agreement, 2026-2027 School Year. A true and correct copy of that agreement is attached as Exhibit L.

193. It then stated: "Families understand and agree that[] [c]urriculum funds **may not be used** to purchase or reimburse any materials, curriculum, classes, or activities that are **religious in nature**." Ex. L.

194. The agreement listed five examples of curricula that were ineligible for reimbursement—all were curricula grounded in Christianity.

195. Importantly, the first two curricula listed as ineligible for reimbursement were the very ones that the District knows that Mrs. Bulzan uses—Abeka and Classical Conversations. Another listed curriculum—The Good and the Beautiful—is one that Mrs. Bulzan already purchased to use during the 2026-2027 school year.

196. The “agreement” then made clear that families could participate in HSDHP and “choose to use religious materials in their homeschool”; but those “**items [could] not be submitted for reimbursement or purchase using program funds.**” Ex. L.

197. The agreement discussed other HSDHP components as well. For example, it stated that parents with students that participated in the on-site program days must be a “Room Parent volunteer at least once per quarter.” Ex. L (emphasis removed).

198. But the HSDHP administrator, Ms. Kellar, stated that the rules were “flexible,” and she could make an exception for the parent after the parent signed the agreement.

199. At the bottom of the agreement, it stated: “Failure to meet program requirements may result in **removal from the Homeschool Partnership Program and is at the discretion of HP staff and administration**.” Ex. L.

200. It then asked parents to sign to acknowledge that they had “read, underst[oo]d, and agree[d] to the expectations outlined in this agreement.” Ex. L.

201. To date, neither Mrs. Bulzan nor her husband have signed the agreement because they object to the prohibition of reimbursement for religious materials.

### VIII. The District's actions violated, and will continue to violate, Mrs. Bulzan's sincerely held religious beliefs, her parental rights, and her free-speech rights.

202. Mrs. Bulzan's Christian faith and religious beliefs are central to the way she lives her life and raises her family.

203. Mrs. Bulzan's beliefs are founded on the Bible and the teachings of Jesus Christ.

204. Mrs. Bulzan strives to live out her Christian faith daily by integrating it into every part of her life, including her work, home, and family.

205. Mrs. Bulzan believes that religious convictions are the most important lessons she can impart on her children, and so she regularly prays with them and discusses faith with her children.

206. Mrs. Bulzan intentionally has age-appropriate conversations with her children about Biblical principles.

207. While Mrs. Bulzan does not impose her Christian beliefs on anyone, her faith informs her sincerely held religious beliefs that shape and govern her views about human nature, child-rearing, the parent-child relationship, and education, among other topics.

208. Mrs. Bulzan believes that God created the family and charged parents with the primary responsibility of raising, guiding, and caring for their children.

209. Mrs. Bulzan believes that parents and family play an essential role in maintaining a child's physical and mental health and well-being.

210. Mrs. Bulzan believes that she has a God-given responsibility to provide for and participate in all aspects of her children's upbringing consistent with her faith.

211. Mrs. Bulzan believes that she has the responsibility under God to educate and protect her children and to raise them in the nurture and admonition of the Lord.

212. For Mrs. Bulzan, government school is premised on assumptions that are antithetical to her faith, and thus a government-school curriculum cannot educate her children consistent with her religious beliefs.

213. Because for Mrs. Bulzan faith cannot be cordoned off into discrete areas of life, this responsibility extends not just to spiritual growth and training, but also to education and physical, mental, and emotional health.

214. In fact, Mrs. Bulzan believes that spiritual growth cannot be separated from academic growth.

215. Mrs. Bulzan believes that faith permeates every aspect of life and that she has a duty to reveal that truth by incorporating faith into everyday aspects of her children's lives, such as in her children's general-education curriculum.

216. For Mrs. Bulzan, there is no divide between the secular and sacred; Jesus is Lord of everything, not just materials or activities that look overtly religious.

217. In other words, Mrs. Bulzan believes that math reveals the God-ordained order of creation, and science is the exploration of the natural world that God created and a way to understand Him better.

218. Mrs. Bulzan chose her homeschooling materials and programs in accordance with her family's religious beliefs and with the aim of instilling faith in her children.

## IX. Defendants' policy and practice is irreparably harming Mrs. Bulzan and her children.

219. The reimbursement denials created financial strain for Mrs. Bulzan and her family during the school year.

220. Homeschooling is already expensive, especially because it required Mrs. Bulzan's family to sacrifice her corporate salary and live on the salary her husband earns as a civil servant.

221. Without the reimbursement for religious curriculum, Mrs. Bulzan will not have access to certain materials or extracurriculars that she would like to incorporate into her children's education.

222. In addition, the "agreement" that HSDHP tried to force Mrs. Bulzan to sign to continue participating in HSDHP threatens to kick Mrs. Bulzan out of HSDHP if she submits reimbursement requests for religious materials.

223. Mrs. Bulzan does not know what curricula or materials that HSDHP would deem religious.

224. HSDHP asserts that the removal decision "is at the discretion of HP staff and administration."

225. Being forced out of HSDHP would require Mrs. Bulzan and her children to forgo in-person activities and learning opportunities.

226. Because HSDHP did not threaten to eject her from the program until orientation, Mrs. Bulzan would not be able to join another homeschooling program and would lose the opportunity to receive any reimbursements.

227. Mrs. Bulzan makes choices about what academic materials her children use and what extracurriculars they engage in based on her children's needs and what she can afford. The availability of reimbursements immediately impacts those decisions.

228. If HSDHP removed Mrs. Bulzan from the program because of her religious reimbursement requests, Mrs. Bulzan's children would likely not be able to participate in certain extracurricular activities that could impact their future.

229. Also, because her daughter has dyslexia, she sometimes receives special tutoring.

230. Mrs. Bulzan has asked for reimbursement through HSDHP for one tutoring session for the 2026-2027 school year.

231. The tutoring sessions are expensive.

232. If Mrs. Bulzan submitted materials that HSDHP deemed "religious" for reimbursement and HSDHP followed through on its threat to "remov[e] [her] from the Homeschool Partnership Program" for submitting "religious materials" "for reimbursement," that would create a financial strain on the family and could impact her daughter's tutoring.

233. Mrs. Bulzan and her children would also be denied engagement in activities with other homeschool families within her community that HSDHP provides.

234. Mrs. Bulzan desires to continue participating in HSDHP to take advantage of the in-person opportunities in her community through a program that her tax dollars support.

## CAUSES OF ACTION

235. All the acts, policies, and practices alleged in this Complaint and attributed to Defendants were undertaken and maintained under color of law.

236. Pursuant to the District's and ODE's policies and practices, Defendants denied Mrs. Bulzan a generally available benefit—reimbursement for her homeschool curriculum and other educational materials and fees—based solely on religion.

237. Pursuant to the District's and ODE's policies and practices, Defendants discriminated against Mrs. Bulzan's speech because of its religious viewpoint.

238. The policies and practices that led Defendants to deny Mrs. Bulzan equal access to a public benefit because her materials and instruction had a religious worldview and a religious viewpoint remain in full force and effect.

239. Defendants' refusal to reimburse Mrs. Bulzan's homeschool materials and fees because they contained religious statements and a religious viewpoint while reimbursing homeschool curricula that do not mention religion is not narrowly tailored to a compelling governmental interest.

240. Absent an injunction, Mrs. Bulzan and her homeschooled children will suffer irreparable harm for which they lack an adequate remedy at law.

241. The threat of irreparable harm to Mrs. Bulzan and her children outweighs any alleged harm Defendants may claim an injunction would cause them.

242. An injunction will not adversely affect the public interest.

## FIRST CAUSE OF ACTION
## Free Exercise of Religion
## (U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)

### Free Exercise – Public Benefits Cannot Discriminate Against Religion

243. Mrs. Bulzan repeats and realleges each of the allegations in paragraphs 1–234 of this Complaint.

244. The First Amendment, incorporated against the States and their subdivisions by the Fourteenth Amendment, bars state laws "prohibiting the free exercise [of religion]." U.S. Const., amend. I; *see id.*, amend. XIV.

245. The Free Exercise Clause "protects religious observers against unequal treatment" and forbids States from imposing "special disabilities on the basis of religious views or religious status." *Espinoza*, 591 U.S. at 475 (quoting *Trinity Lutheran*, 582 U.S. at 458) (collecting cases).

246. Thus, States cannot “discriminate[] against otherwise eligible recipients by disqualifying them from a public benefit” based on “religious character.” *Trinity Lutheran*, 582 U.S. at 462.

247. Defendants have done just that here; they have “den[ied] the benefit based on [Mrs. Bulzan’s] religious exercise,” which the Free Exercise Clause “prohibit[s].” *Carson*, 596 U.S. at 785. Oregon does not have to subsidize homeschool materials, but once it “decides to do so, it cannot disqualify some [homeschool materials] solely because they are religious.” *Carson*, 596 U.S. at 779–80, 785 (quoting *Espinoza*, 591 U.S. at 487).

248. Mrs. Bulzan’s choice to provide her children a religious education is “a choice protected by the Constitution.” *Espinoza*, 591 U.S. at 486 (citing *Pierce v. Soc’y of Sisters*, 268 U.S. 510, 534–35 (1925)). By “cutting [Mrs. Bulzan] off from otherwise available benefits” because she “cho[]se a religious [education] rather than a secular one, and for no other reason,” Defendants “penalize[d] that decision” and substantially burdened Mrs. Bulzan’s ability to exercise her religion. *Id.*

249. That burden “triggers the most exacting scrutiny.’” *Espinoza*, 591 U.S. at 475 (quoting *Trinity Lutheran*, 582 U.S. at 462). Indeed, “[w]hen otherwise eligible recipients are disqualified from a public benefit ‘solely because of their religious character’” or because they may “put[] aid to religious *uses*,” courts “must apply strict scrutiny.” *Id.* at 484 (citing *Trinity Lutheran*, 582 U.S. at 458-62); *Carson*, 596 U.S. at 786 (quoting *Espinoza*, 591 U.S. at 478).

250. Defendants’ actions also receive strict scrutiny because they were neither neutral toward religion nor generally applicable: they specifically targeted religion.

251. Mrs. Bulzan's homeschool is not a public school, even when she participates in HSDHP. Her religious curriculum cannot be a public-school curriculum; Mrs. Bulzan's homeschool is not providing public education.

252. Oregon allows parents to "operate schools of [their] own" and provides a monetary benefit to those parents. Oregon's "administration of that benefit is subject to the free exercise principles governing any such public benefit program—including the prohibition on denying the benefit based on a recipient's religious exercise," no matter how "the benefit and restriction are described." *Carson*, 596 U.S. at 785, 789.

253. Defendants' actions burdening Mrs. Bulzan's First Amendment rights fail strict scrutiny because they are not narrowly tailored to any compelling interest.

254. Actions, such as those of Defendants, that "target[] religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Carson*, 596 U.S. at 780–81 (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)). This is not one of those rare cases.

255. Defendants' reason for denying Mrs. Bulzan the reimbursement benefit was only that doing so would "violate the Establishment Clause of the First Amendment or Article I, section 5, of the Oregon Constitution."

256. Defendants do not have any sufficient antiestablishment interest in curtailing religious, "independent choices of private benefit recipients" who are participating in "a neutral benefit program." *Carson*, 596 U.S. at 781 (citing *Zelman v. Simmons-Harris*, 536 U.S. 639, 652–53 (2002)). Indeed, "[a] State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.*

257. Nor have Defendants used the least restrictive means of—or narrowly tailored their actions toward—serving any interest they may have.

258. Defendants performed their actions burdening Mrs. Bulzan's First Amendment rights pursuant to a policy and practice of the District and ODE.

259. Defendants' violation of Mrs. Bulzan's First Amendment rights has caused her to suffer damages, including (but not limited to) costs related to her homeschooling instruction.

260. Defendants' policy and practice, along with application to Mrs. Bulzan, violated and continue to violate the Constitution.

261. By violating Mrs. Bulzan's free-exercise rights, Defendants have irreparably harmed Mrs. Bulzan, and absent an injunction, will continue to irreparably harm Mrs. Bulzan and her children. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

262. An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

**Free Exercise – Right to Direct Children's Religious Upbringing**

263. Mrs. Bulzan repeats and realleges each of the allegations in paragraphs 1–234 of this Complaint.

264. The First Amendment, incorporated against the States and their subdivisions by the Fourteenth Amendment, bars state laws "prohibiting the free exercise [of religion]." U.S. Const., amend. I; *see id.*, amend. XIV.

265. The Free Exercise Clause "protects 'the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of' religious acts." *Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025)

(quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022)). For Mrs. Bulzan, "there are few religious acts more important than the religious education of [her] children," and "the religious education of [her] children is not merely a preferred practice but rather a religious obligation." *Id.* at 547 (citing *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 754–56 (2020)).

266. "The practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection from our Constitution." *Id.* Mrs. Bulzan's free-exercise rights include the right to raise her children in accordance with her religious beliefs and the right to direct her children's education and religious upbringing consistent with her religious beliefs. *E.g.*, *Mahmoud*, 606 U.S. at 543, 546–48, 568; *Espinoza*, 591 U.S. at 486; *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881–82 (1990); *Parham v. J.R.*, 442 U.S. 584, 590 (1979); *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972); *Pierce*, 268 U.S. at 518.

267. "[T]hose rights are violated by government policies that 'substantially interfer[e] with the religious development' of children." *Mahmoud*, 606 U.S. at 546 (quoting *Yoder*, 406 U.S. at 218). Such policies "carr[y] with [them] precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent." *Id.* (quoting *Yoder*, 406 U.S. at 218).

268. Denying reimbursement for religious curriculum and materials substantially interferes with Mrs. Bulzan's right to direct the religious upbringing of her children. Indeed, Defendants' "educational requirement" that Mrs. Bulzan strip "Christian beliefs and themes" from her curriculum and other materials to receive reimbursement "would 'substantially interfer[e] with the religious development' of [her] child[ren] or pose 'a very real threat of undermining' the religious beliefs and practices the parent wishes to instill in [her] child[ren]." *Id.* at

556 (quoting *Yoder*, 406 U.S. at 218). That requirement thus violates Mrs. Bulzan's free-exercise rights. *Id.* at 556 (quoting *Yoder*, 406 U.S. at 218).

269. Indeed, "[p]ublic education is a public benefit." *Id.* at 561. Defendants "cannot 'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise." *Id.* (citing *Trinity Lutheran*, 582 U.S. at 462).

270. The condition here is particularly troublesome because "education is compulsory in" Oregon. *Id.*; O.R.S. § 339.010. Providing "education is an expensive endeavor," and religious "alternatives" to a traditional public-school education can be "prohibitively expensive." *Mahmoud*, 606 U.S. at 561–62. "[H]omeschooling comes with a hefty price," both in educational expenditures and "forgoing additional income opportunities." *Id.* at 562. Defendants' requirement that homeschool families must strip religion from their instruction to receive limited financial support from HSDHP makes a potential substitute for traditional public-school education even more costly for religious families. *Id.* at 561–62. Defendants increase the financial burden on religious families even though those families "already contribute to financing the public schools" by paying "property and income taxes." *Id.* at 562.

271. Because Defendants substantially interfered with Mrs. Bulzan's religious upbringing of her children—an "unacceptable" burden on religious exercise—Defendants' actions receive strict scrutiny regardless of whether the policy is neutral and generally applicable. *Id.* at 550, 564–65.

272. In all events, Defendants' actions would receive strict scrutiny because the actions were not neutral and generally applicable—they specifically target religion.

273. Defendants' actions burdening Mrs. Bulzan's First Amendment rights fail strict scrutiny because they are not narrowly tailored to any compelling interest.

274. Actions, such as those of Defendants, that "target[] religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Carson*, 596 U.S. at 780–81 (quoting *Hialeah*, 508 U.S. at 546). This is not one of those rare cases.

275. Defendants' reason for denying Mrs. Bulzan the reimbursement benefit was only that doing so would "violate the Establishment Clause of the First Amendment or Article I, section 5, of the Oregon Constitution."

276. Defendants do not have any sufficient antiestablishment interest in curtailing religious, "independent choices of private benefit recipients" who are participating in "a neutral benefit program." *Carson*, 596 U.S. at 781 (citing *Zelman*, 536 U.S. at 652–53). Indeed, "[a] State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.*

277. Nor have Defendants used the least restrictive means of—or narrowly tailored their actions toward—serving any interest they may have.

278. Defendants performed their actions burdening Mrs. Bulzan's First Amendment rights pursuant to a policy and practice of the District and ODE.

279. Defendants' violation of Mrs. Bulzan's First Amendment rights has caused her to suffer damages, including (but not limited to) costs related to her homeschooling instruction.

280. Defendants' policy and practice, along with application to Mrs. Bulzan, violated and continue to violate the Constitution.

281. By violating Mrs. Bulzan's free-exercise rights, Defendants have irreparably harmed Mrs. Bulzan, and absent an injunction, will continue to irreparably harm Mrs. Bulzan and her children. *See Cuomo*, 592 U.S. at 19 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod*, 427 U.S. at 373)).

282. An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

**SECOND CAUSE OF ACTION**
**Fundamental Right to Direct Child's Upbringing and Education**
**(U.S. Const., amend. XIV; 42 U.S.C. § 1983)**

283. Mrs. Bulzan repeats and realleges each of the allegations in paragraphs 1–234 of this Complaint.

284. The Fourteenth Amendment prohibits the States from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," and from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

285. This Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

286. Among the fundamental rights and liberty interests the Supreme Court has recognized is "the [liberty] interest of parents in the care, custody, and control of their children"—"perhaps the oldest of the fundamental liberty interests recognized" by the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). Indeed, the Court's "long-established precedent" confirms the right, emphasizing that "parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026)

(quoting *Pierce*, 268 U.S. at 534–35) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923)).

287. This fundamental right "without doubt" includes the right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer*, 262 U.S. at 399, 401. "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 232.

288. Mrs. Bulzan's right to direct her children's education and upbringing includes the right to homeschool, and specifically the right to use religious instruction in her homeschool. *Pierce*, 268 U.S. at 534–35; *Yoder*, 406 U.S. at 218–19.

289. The fundamental right of parents to direct the upbringing and education of their children is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21 (citation omitted). "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Yoder*, 406 U.S. at 232.

290. A parent's right to direct their child's education and upbringing does not end at the schoolhouse door. S*ee Mirabelli*, 607 U.S. at 496–97.

291. The government may not condition a benefit on a person's non-exercise of a constitutional right, including the right to direct the upbringing of one's child. *E.g.*, *Mahmoud*, 606 U.S. at 530, 561; *cf. Koontz v. St.Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("[T]he government may not deny a benefit to a person because he exercises a constitutional right." (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 545 (1983))).

292. Defendants substantially interfered with and denied Mrs. Bulzan her fundamental right to direct the upbringing and education of her children by

conditioning a public benefit on her forfeiting that fundamental right—by requiring her not to use religious materials to educate her children in order to receive the reimbursement benefit.

293. Once the District chose to provide an otherwise generally available benefit to homeschooling families, it could not deny that benefit because of how Mrs. Bulzan chose to exercise her right to direct the education and upbringing of her children.

294. Strict scrutiny applies to Defendants' violation of Mrs. Bulzan's fundamental rights to direct the upbringing and education of her children. *Mirabelli*, 607 U.S. at 496–97.

295. Defendants' actions violating Mrs. Bulzan's fundamental rights are not narrowly tailored to any compelling interest.

296. Defendants performed their actions violating Mrs. Bulzan's fundamental rights pursuant to a policy and practice of the District and ODE.

297. Defendants' actions, including those performed by the District's employees pursuant to the District's and ODE's policy and practice, are unlawful under the Fourteenth Amendment.

298. Defendants' violation of Mrs. Bulzan's fundamental rights has caused her to suffer damages, including (but not limited to) costs related to her homeschooling instruction.

299. Defendants' policy and practice, along with application to Mrs. Bulzan, violated and continue to violate the Constitution.

300. By violating Mrs. Bulzan's fundamental rights, Defendants have irreparably harmed Mrs. Bulzan, and absent an injunction, will continue to irreparably harm Mrs. Bulzan.

301. An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

**THIRD CAUSE OF ACTION**
**Freedom of Speech**
**(U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)**

302. Mrs. Bulzan repeats and realleges each of the allegations in paragraphs 1–234 of this Complaint.

303. The First Amendment, incorporated against the States by the Fourteenth Amendment, bars state laws "abridging the freedom of speech." U.S. Const., amend. I; *see id.*, amend. XIV. This Free Speech clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

304. "A teacher's teaching is expression to which the First Amendment applies." *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003) (quoting *Wilson v. Chancellor*, 418 F.Supp. 1358, 1362 (D.Or. 1976)). That applies to homeschool instruction as well. *Id.*

305. The First Amendment also protects the "right to receive information and ideas." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)). That right "naturally extends to educational settings." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972)).

306. Mrs. Bulzan's homeschooling instruction to her children in her home is private speech. The availability of limited public funding does not transform parents' private speech into government speech; the government can "expend[] funds" that support and "facilitate[]" "views from private speakers." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995) (collecting cases).

307. Defendants' actions implicate—and violate—the First Amendment because they put "restraints on the way" that Mrs. Bulzan can speak by refusing to provide otherwise available funds for that speech, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (collecting cases), and they "regulate[] what kind of educational" materials (i.e., speech) Mrs. Bulzan "can offer." *Pac. Coast*, 961 F.3d at 1069 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)).

308. Through HSDHP, Defendants provide instructional funds for parents to teach a wide range of perspectives—unless that perspective is religious. HSDHP specifically excludes any religious educational instruction, including, for example, the Abeka and Classical Conversations curricula. In doing so, Defendants engage in unconstitutional viewpoint discrimination.

309. Viewpoint discrimination is an "egregious" affront to the First Amendment, even if the forum in which the discrimination occurs is of the State's "own creation." *Rosenberger*, 515 U.S. at 829.

310. It "discriminates on basis of viewpoint to permit school property to be used for the presentation of all views . . . except those dealing with the subject matter from a religious standpoint." *Lamb's Chapel v. Ctr. Moriches Union Sch. Dist.*, 508 U.S. 384, 393 (1993).

311. "[G]overnment must abstain" from disadvantaging certain speech where, as here, "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829 (citing *Perry Ed. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983)). And denying "funding" to certain viewpoints is "viewpoint discrimination." *Id.* at 830–31.

312. Defendants cannot withhold otherwise available funding from Mrs. Bulzan's religious speech—because it is religious—when Defendants fund comparable non-religious speech. *Id.* at 834–37.

313. For instance, the District refused to reimburse Abeka because some of its reading worksheets contained sentences such as "The Bible is the Word of God" alongside sentences such as "Sarah will bake cookies for her family." But the District does reimburse the Evan-Moor reading curriculum, which uses similar worksheets that do not mention God.

314. Defendants' discriminatory actions are pursuant to a policy and practice of the District and ODE.

315. Defendants' violation of Mrs. Bulzan's First Amendment right to free speech has caused her to suffer damages, including (but not limited to) costs related to her homeschooling instruction.

316. Defendants' policy and practice, along with application to Mrs. Bulzan, violated and continue to violate the Constitution.

317. By violating Mrs. Bulzan's free-speech rights, Defendants have irreparably harmed Mrs. Bulzan, and absent an injunction, will continue to irreparably harm Mrs. Bulzan. *See Cuomo*, 592 U.S. at 19 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod*, 427 U.S. at 373)).

318. An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

## FOURTH CAUSE OF ACTION
## Equal Protection
## (U.S. Const., amend. XIV; 42 U.S.C. § 1983)

319. Mrs. Bulzan repeats and realleges each of the allegations in paragraphs 1–234 of this Complaint.

320. The Equal Protection Clause of the Fourteenth Amendment prohibits the government from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

321. It forbids the government from treating similarly situated people differently without adequate justification. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 446 (1985).

322. Where, as here, the government's differential treatment is based on religion, the Equal Protection Clause demands strict scrutiny.

323. Mrs. Bulzan is similarly situated to other parents who participate in the HSDHP program. Like those parents, she lives in the Hillsboro School District, she has at least one child in grades K-8, she homeschools her children, she buys certain materials and curricula for the homeschool instruction she provides, and she has chosen to participate in the HSDHP program.

324. HSDHP reimburses parents who choose non-religious instruction for those non-religious educational expenditures.

325. But Defendants refused to reimburse Mrs. Bulzan for her educational expenditures solely because they "embed[] religious perspectives into the curriculum materials," have "Christian beliefs and themes [that] are integrated throughout core subject areas," and were "developed from a religious perspective with a biblical worldview woven through the subjects."

326. Defendants have thus treated Mrs. Bulzan differently from, and less favorably than, similarly situated HSDHP-participants based solely on Mrs. Bulzan's religious beliefs and use of educational materials that incorporate religious principles.

327. This differential treatment cannot survive any level of scrutiny, let alone the strict scrutiny that applies when the government discriminates based on religion.

328. That differential treatment was based on a policy that Defendants continue to enforce.

329. That policy is not facially neutral; it specifically targets Mrs. Bulzan's religious belief, viewpoint, and speech.

330. For example, for the upcoming school year, the District tried to make parents sign a paper stating: "Families understand and agree that[] [c]urriculum funds **may not be used** to purchase or reimburse any materials, curriculum, classes, or activities that are **religious in nature**" and listed at least three curricula that Mrs. Bulzan uses as ones disqualified from reimbursement because they were "**religious in nature**."

331. That policy triggers strict scrutiny, which Defendants cannot satisfy.

332. Defendants have identified no compelling government interest that justifies its discrimination against Mrs. Bulzan.

333. Nor have Defendants employed the least restrictive means to achieve any potential government interest.

334. Defendants' policy and practice, along with application to Mrs. Bulzan, violated and continue to violate the Constitution.

335. Defendants' violation of Mrs. Bulzan's Fourteenth Amendment right to equal protection has caused her to suffer damages, including (but not limited to) costs related to her homeschooling instruction.

336. Absent injunctive and declaratory relief, Mrs. Bulzan is and will continue to be irreparably harmed.

337. An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

## PRAYER FOR RELIEF

Mrs. Bulzan respectfully requests that this Court enter judgment against Defendants and provide the following relief:

A. A declaration that the District's and ODE's policy, facially and as applied to Mrs. Bulzan, violates Mrs. Bulzan's First and Fourteenth Amendment rights under the United States Constitution;

B. An injunction that requires Defendants to reimburse Mrs. Bulzan's homeschool curriculum and other materials that meet the HSDHP criteria regardless of religious content, as long as her children remain enrolled in the HSDHP program;

C. Nominal damages, compensatory damages, including presumed damages, and such other damages to which Mrs. Bulzan may be entitled;

D. Mrs. Bulzan's reasonable attorneys' fees, court costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and,

E. All other relief to which Mrs. Bulzan may be entitled.

Dated: September 22, 2026

Respectfully submitted,

/s/Rebekah Schultheiss

Rebekah Schultheiss
OR Bar No. 121199
LAW OFFICES OF REBEKAH MILLARD, LLC
P.O. Box 7582
Springfield, Oregon 97475
(707) 227-2401
rebekah@millardoffices.com

Kelsey C. Catina*
WA Bar No. 63116
Payton C. Tompkins*
WA Bar No. 61724
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 202-5662
kcatina@ADFlegal.org
ptompkins@ADFlegal.org

Katherine L. Anderson*
AZ Bar No. 33104
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
kanderson@ADFlegal.org

David A. Cortman*
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E., Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

*Counsel for Plaintiff*
**Pro Hac Vice Application Forthcoming*

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I have read the foregoing Complaint and the factual allegations contained therein, that the facts as alleged are true and correct to the best of my knowledge, and that these statements are based on my personal knowledge.

Executed on September 22, 2026.

Tessa Bulzan