Rebekah Schultheiss, OR Bar No. 121199
LAW OFFICES OF REBEKAH MILLARD, LLC
P.O. Box 7582
Springfield, Oregon 97475
(707) 227-2401
rebekah@millardoffices.com

Katherine L. Anderson*, AZ Bar No. 33104
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
kanderson@ADFlegal.org

Kelsey C. Catina*, WA Bar No. 63116
Payton C. Tompkins*, WA Bar No. 61724
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 202-5662
kcatina@ADFlegal.org
ptompkins@ADFlegal.org

David A. Cortman*, GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

*Attorneys for Plaintiff*
**Admitted Pro Hac Vice*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

**TESSA BULZAN**,

*Plaintiff*,

v.

**HILLSBORO SCHOOL DISTRICT; HILLSBORO SCHOOL DISTRICT'S BOARD OF EDUCATION**,

*Defendants*.

Case No. 3:26-cv-01965

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**

**Request for Oral Argument**

**Expedited Hearing Requested**

## TABLE OF CONTENTS


Table of Authorities ..... iii

Motion ..... 1

Introduction ..... 2

Factual Background ..... 4

A. Mrs. Bulzan has a sacred duty to educate her children according to her Christian beliefs. ..... 4

B. Mrs. Bulzan enrolls her children in Hillsboro School District's Homeschool Partnership and selects materials that meet (and in many cases exceed) Oregon academic standards. ..... 6

C. The District refuses to reimburse Mrs. Bulzan's homeschooling materials and expenses solely because of their "Christian and biblical worldview." ..... 8

D. Mrs. Bulzan challenges the District's religious discrimination, and the District doubles down, enforcing the District's and Oregon Department of Education's unconstitutional policies and practices. ..... 9

E. The District plans to continue violating Mrs. Bulzan's constitutional rights. ..... 12

Legal Standard ..... 13

Argument ..... 13

I. Mrs. Bulzan is likely to succeed on the merits of each of her claims ..... 13

A. Defendants violate the Free Exercise Clause. ..... 14

1. Defendants trigger strict scrutiny by excluding Mrs. Bulzan's educational materials from an otherwise available government reimbursement because of their religious perspective. ..... 14

2. Defendants' actions trigger strict scrutiny because they substantially interfere with Mrs. Bulzan's right to direct the religious upbringing of her children. ..... 20

3. Defendants' actions trigger strict scrutiny because they are neither neutral nor generally applicable. ..... 23

4. Defendants cannot survive strict scrutiny. ..... 26

B. Mrs. Bulzan is likely to succeed on her Fourteenth Amendment parental-rights claim. ..... 26

C. Mrs. Bulzan is likely to succeed on her free-speech claim. ........................ 29
II. Mrs. Bulzan satisfies the other preliminary injunction factors. ..................... 33
Conclusion ........................................................................................................ 35

## TABLE OF AUTHORITIES

### Cases

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 13

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......... 34

*Carson v. Makin*,
596 U.S. 767 (2022) .......... 2, 3, 14, 16, 19, 20, 21, 24, 25, 26, 29, 34

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993) .......... 23, 24, 25

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) .......... 34

*Dunn v. Blumstein*,
405 U.S. 330 (1972) .......... 28

*Employment Division, Department of Human Resources of Oregon v. Smith*,
494 U.S. 872 (1990) .......... 23

*Espinoza v. Montana Department of Revenue*,
591 U.S. 464 (2020) .......... 2, 14, 15, 20, 21

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*,
82 F.4th 664 (9th Cir. 2023) .......... 34

*Frost & Frost Trucking Co. v. Railroad Commission of California*,
271 U.S. 583 (1926) .......... 28

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .......... 23, 25

*Goulart v. Meadows*,
345 F.3d 239 (4th Cir. 2003) .......... 29

*Hall v. U.S. Department of Agriculture*,
984 F.3d 825 (9th Cir. 2020) .......... 13

*Harman v. Forssenius*,
380 U.S. 528 (1965) .......... 27, 28

*Koontz v. St.Johns River Water Management District*,
570 U.S. 595 (2013) .......... 27, 28

*Lamb's Chapel v. Center Moriches Union School District*,
508 U.S. 384 (1993) .......... 32

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 2, 3, 20, 21, 22, 23, 27, 29, 33

*McDaniel v. Paty*,
435 U.S. 618 (1978) .......... 15

*Memorial Hospital v. Maricopa County*,
415 U.S. 250 (1974) .......... 28

*Meyer v. Nebraska*,
262 U.S. 390 (1923) .......... 27, 28

*Mirabelli v. Bonta*,
607 U.S. 492 (2026) .......... 2, 3, 21, 27, 29, 33

*Mobilize the Message, LLC v. Bonta*,
50 F.4th 928 (9th Cir. 2022).......... 13, 33

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 34

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 732 (2020) .......... 21

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*,
961 F.3d 1062 (9th Cir. 2020) .......... 29

*Perry Education Association v. Perry Local Educators' Association*,
460 U.S. 37 (1983) .......... 31, 32

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925) .......... 27

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 32

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) .......... 27

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 29

*Rosenberger v. Rector and Visitors of University of Virginia*,
515 U.S. 819 (1995) .......... 2, 4, 30, 31, 32, 33

*Sherbert v. Verner*,
374 U.S. 398 (1963) .......... 15

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 29, 31

*Tandon v. Newsom*,
593 U.S. 61 (2021) .......... 25

*Thomas v. Review Board of Indiana Employment Security Division*,
450 U.S. 707 (1981) .......... 19

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) .......... 2, 14, 15, 22, 23, 24

*Troxel v. Granville*,
530 U.S. 57 (2000) .......... 27

*United States v. American Library Association, Inc.*,
539 U.S. 194 (2003) .......... 28

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......... 26

*Wieman v. Updegraff*,
344 U.S. 183 (1952) .......... 28

*Wilson v. Chancellor*,
418 F.Supp. 1358 (D.Or. 1976) .......... 29

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) .......... 13

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .......... 20, 21, 23, 27

*Woolard v. Thurmond*,
170 F.4th 701 (9th Cir. 2026) .......... 17, 30

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002) .......... 3, 26, 29

**Statutes**

Or. Rev. Stat. § 339.010 .......... 22

## MOTION

Plaintiff Tessa Bulzan moves this Court under Fed. R. Civ. P. 65 to issue a preliminary injunction:

1. Enjoining Defendants from discriminating against Mrs. Bulzan in the HSDHP reimbursement program on account of religion, including by denying reimbursement for materials or curricula because of their religious perspective or religious themes;
2. Enjoining Defendants from removing Mrs. Bulzan from the Hillsboro School District's Homeschool Partnership (HSDHP) if she submits materials or curricula for reimbursement that Defendants deem religious; and
3. Enjoining Defendants from requiring Mrs. Bulzan to sign anything that conditions participation in HSDHP on forgoing reimbursement for curricula or materials that Defendants deem religious.

This Motion is supported by the Verified Complaint (ECF 1), its Exhibits, the Memorandum in Support below, Declaration of Tessa Bulzan in Support of Plaintiff's Motion for Preliminary Injunction (Decl.) and its Exhibit, and any later briefing in support of this Motion. The parties made a good-faith effort to resolve the issues presented in this Motion through emails and a Zoom conference but were unable to do so. Plaintiff's counsel notified Defendants' counsel in advance before filing this Motion, which Defendants oppose.

## INTRODUCTION

This case is about a school district denying a homeschooling mother reimbursement for her children's curricula solely because those materials teach from a "Christian and biblical worldview." The Constitution does not permit such religious discrimination. The First Amendment prohibits the government from forcing a person to choose between religious exercise and participation in an otherwise available public benefit. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017); *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 476 (2020); *Carson v. Makin*, 596 U.S. 767, 778–80 (2022). It protects a parent's right to "guide" her children's religious development. *Mahmoud v. Taylor*, 606 U.S. 522, 559 (2025). And it precludes the government from excluding speech because of its religious viewpoint. *E.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–31 (1995). The Fourteenth Amendment also protects a parent's right to direct her children's upbringing and education. *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026).

Yet the Hillsboro School District has defied those principles. Tessa Bulzan is a Christian mother of five who homeschools her children in Hillsboro, Oregon. She chose curricula including Abeka, Classical Conversations, and Firmly Planted Hillsboro because they teach core academic subjects from a God-centered perspective while exceeding Oregon's academic standards.

To help fund her homeschool, Mrs. Bulzan enrolled her children in the District's Homeschool Partnership (HSDHP), which provides a $2,000-per-child curriculum allowance for the materials and instruction of a family's choosing. But when Mrs. Bulzan submitted her receipts, the District refused to reimburse her—not because the materials failed any academic standard, but because "Christian

beliefs and themes" were "integrated throughout core subject areas" and a "biblical worldview" was "woven through the subjects."

Mrs. Bulzan challenged the District's discrimination through its four-step complaint process. At every step, the District doubled down—repeatedly consulting the Oregon Department of Education, which backed the refusal. And this school year, the District went further: it distributed instructions to HSDHP families listing five curricula as ineligible for reimbursement—all Christian—with the first two being the very ones the District knows Mrs. Bulzan uses. The instructions threatened families with "removal from the Homeschool Partnership Program" if they submitted religious materials for reimbursement. And it is unclear exactly what the District will deem religious.

The District said that reimbursing religious curricula would violate the Establishment Clause. Not so. "[I]ndependent choices of private benefit recipients" who are participating in "a neutral benefit program" do not violate the Establishment Clause. *Carson*, 596 U.S. at 768 (citing *Zelman v. Simmons-Harris*, 536 U.S. 639, 652–53 (2002)).

After rebutting the District's sole defense, recent First Amendment precedent answers this case. Under *Carson*, the government "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits" because of their religious character. 596 U.S. at 778. Under *Mahmoud*, a government policy that "pose[s] 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill" in their children triggers "the most exacting scrutiny." 606 U.S. at 565. Under *Mirabelli*, parents—not the State—have "primary authority" over their children's "upbringing and education." 607 U.S. at 497. And under the Supreme Court's free-speech precedent, the government

cannot fund private speech but exclude religious speech. *See Rosenberger*, 515 U.S. at 829–31. Defendants' policy and actions violate the Constitution four times over.

Because the 2026-2027 school year has already begun and Defendants continue to enforce their discriminatory reimbursement policy, Mrs. Bulzan needs a preliminary injunction barring the District from denying reimbursement for her children's curricula and materials because of their religious character. The District's discretionary authority and the looming threat of ejection preclude Mrs. Bulzan from seeking reimbursement for wide swaths of her curricula. That limits her children's educational opportunities, which her children can never get back.

This Court should enter an order enjoining Defendants from (1) discriminating against Mrs. Bulzan in the HSDHP reimbursement program on account of religion, including by denying reimbursement for materials or curricula because of their religious perspective or religious themes, (2) removing Mrs. Bulzan from HSDHP if she submits materials or curricula for reimbursement that Defendants deem religious, and (3) requiring Mrs. Bulzan to sign anything that conditions participation in HSDHP on forgoing reimbursement for curricula or materials that Defendants deem religious.

## FACTUAL BACKGROUND

### A. Mrs. Bulzan has a sacred duty to educate her children according to her Christian beliefs.

Mrs. Bulzan is a mother of five children who lives with her husband in Hillsboro, Oregon. Compl. ¶¶ 11–12. Mrs. Bulzan's Christian faith is central to the way she lives her life and raises her family. *Id.* ¶ 202. Mrs. Bulzan's faith governs her views about human nature, child-rearing, the parent-child relationship, and education, among other topics. *Id.* ¶ 207.

For instance, Mrs. Bulzan believes that God created the family and charged parents with the primary responsibility of raising, guiding, and caring for their children. *Id.* ¶ 208. She believes that she has a God-given responsibility to provide for and participate in all aspects of her children's upbringing consistent with her faith. *Id.* ¶ 210. And she believes that she has the responsibility under God to educate and protect her children and to raise them in the nurture and admonition of the Lord. *Id.* ¶ 211.

Specifically, Mrs. Bulzan believes that spiritual growth cannot be separated from academic growth. *Id.* ¶ 214. She has a sacred duty to reveal truth by incorporating faith into everyday aspects of her children's lives, such as in her children's general-education curriculum. *Id.* ¶ 215. For Mrs. Bulzan, there is no divide between the secular and sacred; Jesus is Lord of everything, not just materials or activities that look overtly religious. *Id.* ¶ 216. And a government-school curriculum cannot educate her children consistent with her religious beliefs. *Id.* ¶ 212.

Mrs. Bulzan began homeschooling her oldest child in 2022. *Id.* ¶ 25. She chose to use the Abeka curriculum because it "provide[d] an excellent education from a Christian perspective" and met her daughter's needs. *Id.* ¶ 37. Specifically, her daughter has dyslexia, and Abeka has a cursive curriculum, which helps children with dyslexia. *Id.* ¶¶ 34–36. As Mrs. Bulzan continued homeschooling, she incorporated other curricula and opportunities. For instance, Mrs. Bulzan added Classical Conversations—a "Christ-centered homeschool curriculum" done "with a local community of like-minded families." *Id.* ¶ 40. She also chose to join Firmly Planted Hillsboro—a "Christ-centered homeschooling co-op"—because of its

Christian values and opportunities to take fun lessons with other children. *Id.* ¶¶ 43–44.

### B. Mrs. Bulzan enrolls her children in Hillsboro School District's Homeschool Partnership and selects materials that meet (and in many cases exceed) Oregon academic standards.

In 2025, Mrs. Bulzan learned that her school district offered a Homeschool Partnership program (HSDHP). According to the District, the program exists "to empower families in creating personalized, meaningful education." *Id.* ¶ 55. It does so by providing a "curriculum allowance" of $2,000 per child per year as well as a "tech stipend." *Id.* ¶ 49. The program allows families "the freedom to use [their] homeschool curriculum materials to provide individualized, parent-taught academic instruction at home" and offers optional in-person classes, such as music or PE, at a local elementary school. *Id.* ¶¶ 15, 56.

Because homeschooling is expensive and the Bulzan's operate on one income—a necessity because Mrs. Bulzan homeschools—Mrs. Bulzan enrolled her children in the program, thrilled that her tax dollars were helping offset the significant cost of her children's education. *Id.* ¶ 51, 183, 234. She was also excited that the program allowed her children to engage in their community through the program's optional in-person activities and learning. *Id.* ¶ 53. Upon enrolling, Ms. Margaret Kellar, the program's administrator, explained that Mrs. Bulzan could use any curriculum, even a religious one. She also noted that instruction on religion could not be reimbursed but implied that academic curricula that referenced God or Scripture could be reimbursed. *Id.* ¶¶ 93–95.

HSDHP had no involvement in or oversight of the curricula or materials that Mrs. Bulzan chose to use in her homeschool. *Id.* ¶¶ 64, 74–75. Nor did HSDHP

require as a prerequisite to participation that Mrs. Bulzan's curriculum be aligned with any state or local content standards. *Id.* ¶ 67. No HSDHP employee provided any instruction to her children. *Id.* ¶¶ 76–77. In fact, no one from HSDHP ever met her children. *Id.* ¶ 78. Instead, Mrs. Bulzan alone selected the study methods and materials that she used to educate her children. *Id.* ¶ 68. While participating in HSDHP, Mrs. Bulzan's children did not take any state assessments or participate in any state testing. *Id.* ¶ 69.

In fact, to participate in HSDHP, the District required just two things of Mrs. Bulzan. *Id.* ¶ 71. One, the District required Mrs. Bulzan to log into an app and "like" a message for each day she taught homeschool. *Id.* ¶ 72. Two, the District required Mrs. Bulzan to submit quarterly work samples for certain subjects—which could be religious—and Ms. Kellar met with her once at the beginning of the year to discuss the first work samples and answer any questions. *Id.* ¶ 73.

Given the District's answers to her questions and the District's lack of involvement in any of Mrs. Bulzan's homeschool decisions, Mrs. Bulzan continued to use and submitted reimbursement for the portions of Abeka and Classical Conversations that covered core academic subjects—based on the Oregon academic standards—such as language arts, math, history, and science. *Id.* ¶ 101.

The instruction and materials met (and in many cases exceeded) Oregon academic standards in core subjects. *Id.* ¶¶ 102, 106–13. And the District accepted work samples from these curricula without ever questioning their academic value. *See id.* ¶¶ 60, 73.

### C. The District refuses to reimburse Mrs. Bulzan's homeschooling materials and expenses solely because of their "Christian and biblical worldview."

At the end of the first semester, Defendants refused to reimburse any part of the cost for Abeka, Classical Conversations, or Firmly Planted Hillsboro. *Id.* ¶¶ 97–100. They refused any reimbursement even though the curricula met (and in many cases exceeded) Oregon academic standards in core subjects and even though many of the lessons and worksheets do not mention God or Scripture. *Id.* ¶¶ 102, 106–13. In fact, the District never disputed the academic value of Mrs. Bulzan's curriculum in any of its correspondence with her. *Id.* ¶ 114. It even told her that it did not know of any cursive curriculum—necessary for her daughter's dyslexia—that was of comparable quality to the Abeka curriculum. *Id.* ¶¶ 35, 38, 124–26. But it still refused to reimburse her because it deemed the materials "religious." *Id.* ¶ 115.

Specifically, the District refused reimbursement only because a "Christian and biblical worldview" undergirded the curricula, stating that "[s]tate funds are not allowed to go toward religious curriculum or fees toward participation in religious groups." *Id.* ¶¶ 116–17.

When Mrs. Bulzan learned that the District would not reimburse any portion of those materials, she contacted Ms. Kellar, stating that she "anticipated more of [her] curriculum being paid for" and explaining she was now in a "financial pinch." *Id.* ¶ 118. She attached examples of the worksheets and projects used in Abeka and how Classical Conversations "mapp[ed] to OR standards" "in hopes they could meet the requirement for reimbursement." *Id.* ¶ 119. But the District would not budge. Instead, it made clear that it would reimburse only if the religious references were "remove[d]." *Id.* ¶ 140. For instance, it specifically stated that "a secular cursive

curriculum similar to Abeka" would be approved for reimbursement—if she could find one. *Id.* ¶ 126.

Despite its stance on Abeka and similar curricula, the District reimburses for materials that promote a wide range of worldviews, including instruction that contradicts Christian beliefs and instruction with other spiritual themes. *Id.* ¶ 83. For instance, for second grade, the District reimburses a book titled: "Julian Is A Mermaid"—a book where a young boy dresses in drag as a mermaid. *Id.* ¶¶ 84–85. For kindergarten, the District reimburses a book titled: "We Are Water Protectors." *Id.* ¶ 87. In that book, a young indigenous girl explains that "[w]ater is sacred" and "has its own spirit." *Id.* ¶¶ 88–89. The author's and illustrator's notes explain that the book is about "the sacred relationship between humanity and all living things" and "protecting our sacred Mother Earth." *Id.* ¶ 90. In other words, the District would reimburse similar, non-religious curricula and materials that expound other worldviews—including spiritual worldviews—but would not reimburse materials from a Christian perspective.

### D. Mrs. Bulzan challenges the District's religious discrimination, and the District doubles down, enforcing the District's and Oregon Department of Education's unconstitutional policies and practices.

Mrs. Bulzan challenged the reimbursement refusal through the District's four-step discrimination-complaint process. *Id.* ¶ 129. Throughout the challenge process, the District reached out to, relied on, and felt bound by the Oregon Department of Education's policy. *Id.* ¶¶ 6, 8, 131–33, 138–39, 145–46, 150–51, 164, 170.

**1. Step One**

At Step One, Mrs. Bulzan filed an official complaint, explaining how HSDHP had discriminated against her based on her religion when it denied reimbursement based solely on the materials' religious perspective. *Id.* ¶ 134. Mrs. Bulzan also spoke at the District's Board meeting and provided examples of Abeka and Classical Conversations materials that both met the Oregon requirements and did not mention God or religion. *Id.* ¶ 136. For example, she provided several second-grade and kindergarten phonics worksheets from Abeka, none of which contained anything overtly religious. *Id.* ¶ 137.

Still, two weeks later, HSDHP Principal Shannon Lawson affirmed the reimbursement refusal, stating that those materials and instructional fees would "violate the Establishment Clause" and "the Oregon Constitution." *Id.* ¶¶ 138–39. Principal Lawson made clear that the reimbursement denial was "based on the instructional content of the materials" and that reimbursement could be approved only if there were a "version[] of the[] curriculum that remove[d] religious instruction." *Id.* ¶ 140. She then explained that "the Abeka curriculum [has] Christian beliefs and themes [that] are integrated throughout core subject areas" and only "[m]aterials that align with Oregon academic standards and do not include religious instruction are allowable for reimbursement." *Id.* ¶ 141. She concluded: "[P]ublic funds cannot be used for materials in which religious instruction is embedded in the core curriculum." *Id.* ¶ 142.

**2. Step Two**

Mrs. Bulzan proceeded to Step Two of the process: appealing Principal Lawson's decision to the District's Superintendent's Office. *Id.* ¶ 144. Once Mrs. Bulzan submitted her Step Two appeal, Assistant Superintendent Andrea Neville

emailed ODE to complain about having to respond to Mrs. Bulzan's complaint and to chastise ODE for "sending [Mrs. Bulzan] detailed steps to launch a discrimination complaint" when Mrs. Bulzan contacted ODE about the discrimination. *Id.* ¶¶ 152–53. She also mentioned a rumor she had heard that another homeschool program was "reimbursing religious curriculum and materials" and said that she "truly hoped" that information was "not accurate." *Id.* ¶¶ 147–48.

Assistant Superintendent Neville then responded formally to Mrs. Bulzan's Step Two submission, asserting that it was "clearly stated on the website and in presentations that families can be reimbursed for approved, **non-religious** curriculum, extracurricular activities, and school supplies." *Id.* ¶ 156. She made clear the District would reimburse curricula that did not "embed[] religious perspectives into the curriculum materials" and "in which religious instruction is not part of the curriculum itself." *Id.* ¶ 161. Ms. Neville concluded that the reimbursement refusal should stand because the District could "not financially support religious activity." *Id.* ¶ 162.

### 3. Step Three

Mrs. Bulzan proceeded to Step Three. *Id.* ¶ 165. She explicitly highlighted recent Supreme Court cases holding that exclusions from generally available benefits because of religious character "'penalize[] the free exercise' of religion" and are "odious to our Constitution." *Id.* ¶ 166. The District hired an outside law firm to issue a report, which upheld the refusal to reimburse. *Id.* ¶¶ 168–70.

### 4. Step Four

Finally, Mrs. Bulzan attempted to appeal to the Board. *Id.* ¶ 171. She again spoke at the District's Board meeting and submitted a written challenge to the religiously based reimbursement denials. *Id.* ¶ 173. But the complaint process

allowed only five days to appeal the Step Three decision, and Mrs. Bulzan's appeal was outside that five-day window. *Id.* ¶ 175. The Board never responded to her appeal. *Id.* ¶ 176. Instead, Assistant Superintendent Neville wrote that because Mrs. Bulzan was "beyond the appeal window . . . the decision rendered at Step 3 is considered the final decision of the District." *Id.* ¶ 177. ODE confirmed that Mrs. Bulzan had "exhausted the Hillsboro School District's discrimination complaint process and received a final decision." *Id.* ¶ 178.

### E. The District plans to continue violating Mrs. Bulzan's constitutional rights.

Mrs. Bulzan's children are enrolled in HSDHP for the 2026-2027 school year. *Id.* ¶ 181. And the District now expressly refuses to reimburse any curriculum that mentions religion. *Id.* ¶ 185. In HSDHP's orientation meeting for the 2026-2027 school year, the District stated that parents could "use [their] curriculum allowance on (secular) non-religious homeschool curriculum, school supplies, and extracurriculars." *Id.* ¶ 187.

The next day, the District provided parents a two-page "agreement" and asked that they sign it for the 2026-2027 school year—even though signing the agreement was not a requirement to enroll. *Id.* ¶¶ 188–93. The agreement states: "Families understand and agree that[] [c]urriculum funds **may not be used** to purchase or reimburse any materials, curriculum, classes, or activities that are **religious in nature**." *Id.* ¶ 193. It then lists five examples of curricula that were ineligible for reimbursement—all are curricula grounded in Christianity. *Id.* ¶ 194. The first two curricula listed as ineligible for reimbursement are the very ones that the District knows that Mrs. Bulzan uses—Abeka and Classical Conversations. *Id.*

¶ 195. Another listed curriculum—The Good and the Beautiful—is one that Mrs. Bulzan already purchased to use during the 2026-2027 school year. *Id.*

The "agreement" makes clear that families may participate in HSDHP and "choose to use religious materials in their homeschool," but those "**items [could] not be submitted for reimbursement or purchase using program funds.**" *Id.* ¶ 196. At the bottom of the agreement, it states: "Failure to meet program requirements may result in **removal from the Homeschool Partnership Program and is at the discretion of HP staff and administration**." *Id.* ¶ 199. To date, neither Mrs. Bulzan nor her husband has signed the agreement because they object to the prohibition of reimbursement for religious materials. *Id.* ¶ 201.

## LEGAL STANDARD

A party moving for a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 934 (9th Cir. 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Likelihood of success is "determinative" in First Amendment cases, so courts typically "confine [their] analysis to that factor." *Id.* (citing *Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 835 (9th Cir. 2020)). A preliminary injunction is also proper when the plaintiff shows "serious questions going to the merits" and a balance of hardships that "tips sharply" in her favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## ARGUMENT

### I. Mrs. Bulzan is likely to succeed on the merits of each of her claims.

Defendants' policy to exclude Mrs. Bulzan's homeschooling materials and expenses from reimbursement solely because of their "Christian and biblical world

view" violates Mrs. Bulzan's free-exercise rights, fundamental parental rights, free-speech rights, and equal-protection rights. A preliminary injunction is warranted.

### A. Defendants violate the Free Exercise Clause.

Defendants' actions and policy violate the Free Exercise Clause in three different ways. One, Defendants exclude parents' religious materials from an otherwise available public benefit, in violation of *Trinity Lutheran*, *Espinoza*, and *Carson*. Two, Defendants condition a public educational benefit on parents' willingness to accept a burden on their religious exercise, in violation of *Mirabelli*, *Mahmoud*, and *Yoder*. Three, Defendants' actions and policy are neither neutral nor generally applicable because they treat parents who use comparable secular materials better than those who use religious materials. All three violations independently trigger strict scrutiny.

#### 1. Defendants trigger strict scrutiny by excluding Mrs. Bulzan's educational materials from an otherwise available government reimbursement because of their religious perspective.

The Supreme Court has "repeatedly held" that the government "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits" because of their "religious character" or "religious exercise." *Carson*, 596 U.S. at 778–81; *accord Trinity Lutheran,* 582 U.S. at 462; *Espinoza,* 591 U.S. at 487. Indeed, in a trilogy of cases over the last decade, the Supreme Court has emphasized that laws that "disqualify" some choices "from funding 'solely because they are religious'" trigger—and fail—"the strictest scrutiny." *Carson*, 596 U.S. at 780 (quoting *Espinoza*, 591 U.S. at 478, 487); *see also Trinity Lutheran*, 582 U.S. at 462–63.

To start, in *Trinity Lutheran*, a state agency offered reimbursement grants to nonprofit organizations that resurfaced their playgrounds with recycled tires. 582 U.S. at 454. But it disqualified religious nonprofits from the program. *Id.* at 455. The Supreme Court applied "basic principle[s]" of free exercise and held that disqualification from "a generally available benefit" because of religion "impose[d] a penalty on the free exercise of religion." *Id.* at 458, 467 (citing *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (plurality)). The Court emphasized that "a penalty on the free exercise of religion" "inevitably deters or discourages the exercise of" a person's constitutional rights and thus triggers "the most exacting scrutiny." *Id.* at 462, 463 (quoting *Sherbert v. Verner*, 374 U.S. 398, 405 (1963)) (cleaned up).

A few years later, the Supreme Court considered a state's tax-credit program for those contributing to scholarships for private-school tuition. *Espinoza*, 591 U.S. at 468–69. But families could not use the scholarships for religious education. *Id.* at 470. The Court held the exclusion unconstitutional, explaining that limiting the benefit to use for nonreligious education burdened families whose children hoped to receive education from a religious perspective. *Id.* at 486. The state's discrimination "put[ ] families to a choice between [provi]ding their children ... a religious [education] or receiving [otherwise available] benefits." *Id.* at 480. It "penalize[d] that decision by cutting families off from otherwise available benefits if they choose a religious" education; it "'punishe[d] the free exercise of religion' by disqualifying the religious from government aid." *Id.* at 478, 486 (citation omitted). In short, when a state decides to "subsidize private education," it cannot disqualify some education "solely because" it is religious. *Id.* at 487. That triggers the "strictest scrutiny." *Id.* at 484.

Finally, in *Carson*, the Supreme Court again addressed a government tuition-assistance program that prohibited families from using the benefit at religious institutions. 596 U.S. at 773–75. Trying to avoid *Trinity Lutheran* and *Espinoza*, the state argued that it did not exclude religious schools based on religious *status*, but excluded schools based on religious *use* because "a school is excluded only if it promotes a particular faith and presents academic material through the lens of that faith." *Id*. at 787. The Court rejected that argument: the very reason religious schools exist is to teach their faith. *Id*. "Any attempt to give effect to such a distinction," the Court continued, would raise serious constitutional concerns. *Id*. The Court then held—yet again—that "[b]y 'condition[ing] the availability of benefits' in that manner, [the government's] tuition assistance program ... 'effectively penalize[d] the free exercise' of religion" and triggered "the strictest scrutiny." *Id*. at 780 (citations omitted).

*Trinity Lutheran*, *Espinoza*, and *Carson* decide this case. They establish that the government cannot subsidize homeschool educational materials but then exclude certain materials solely because of their "Christian and biblical world view." Yet that is what the District does here.

Mrs. Bulzan was "disqualified from this generally available benefit solely because of [its] religious character." *Carson*, 596 U.S. at 780. HSDHP provides funding—a quintessential public benefit—to homeschooling families in its district. *See* Compl. ¶ 49. It exists "to empower families in creating personalized, meaningful education." *Id*. ¶ 55. Any homeschooling family who wants to enroll can do so and receive a $2,000 stipend per child from which the District will reimburse the curricula and materials of the family's choosing—unless the curricula or materials are religious.

Importantly, the religious bar on reimbursement does not extend to a bar on participation in the program. Families participating in the program are allowed to use any curricula, including religious curricula. *Id.* ¶¶ 58, 60, 63, 196. This matters: it shows that the Ninth Circuit's recent decision in *Woolard v. Thurmond*, 170 F.4th 701 (9th Cir. 2026), *petition for cert. filed*, No. 26-237 (U.S. Aug. 24, 2026), does not control. There, the Ninth Circuit considered charter-school programs in California. *Woolard*, 170 F.4th at 707–08. The lynchpin of that case was that the programs were part of the state's chosen "[s]ecular public education." *Id.* at 708. Not so here. HSDHP does not subject families to "extensive legal requirements" or mandate that curricula must be secular as a prerequisite to participation. *Compare id.* at 709–10 *with* Compl. ¶¶ 64–78. HSDHP is a public benefit for homeschool education, not an extension of Oregon's public education.

Defendants repeatedly said that they denied Mrs. Bulzan the reimbursement benefit solely because of the "religious perspectives," "biblical worldview," and "Christian beliefs and themes" that are "woven through the subjects" in Mrs. Bulzan's curricula. Compl. ¶¶ 158, 161, 163. To be clear: Mrs. Bulzan's curricula teach math and science and language arts, among other Oregon core subjects. *Id.* ¶ 101. And the curricula not only meet but exceed Oregon standards. *See id.* ¶¶ 106–11. Most of the materials do not even mention God or religion. *Id.* ¶¶ 136–37. Still, Defendants refused to reimburse those materials. *Id.* ¶¶ 93–180. The reason? "[T]he Christian and biblical worldview" in the materials. *Id.* ¶ 117.

Specifically, Principal Lawson stated that Mrs. Bulzan's chosen curricula were not "allowable for reimbursement" because "Christian beliefs and themes [we]re integrated throughout core subject areas" and "religious instruction [was] embedded in the core curriculum." *Id.* ¶ 141. The Assistant Superintendent doubled

down. She stated that the District would not reimburse Mrs. Bulzan's curricula because one was "developed from a religious perspective with a biblical worldview woven through the subjects" and "use[d] Scripture and Christian principles to explain topics in many areas, including history, science, and sometimes even math" and the other was "intentional about being a Christian, faith-integrated curriculum" that "blend[ed] classical academic methods with a biblical worldview throughout its materials." *Id.* ¶¶ 158–59. She also rejected the co-op fees because the co-op "focused on teaching every subject through a Biblical worldview—integrating Scripture, prayer, and Christian values into both academics and community life." *Id.* ¶ 160. The Oregon Department of Education agreed with Defendants' response. *E.g.*, *id.* ¶ 151.

Defendants confirmed that they would reimburse secular versions of Mrs. Bulzan's curricula. For example, the District refused to reimburse Mrs. Bulzan's cursive curriculum because of its Christian underpinnings, but it told Mrs. Bulzan that if she found "a secular cursive curriculum similar to Abeka," the District would "add it to the list" of curricula approved for reimbursement and "recommend [it] to others." *Id.* ¶ 126. The District did so even though Mrs. Bulzan needed a cursive curriculum to help her daughter's dyslexia, and it told her that it did not know of a secular cursive curriculum comparable to Abeka. *Id.* ¶¶ 35, 38, 124–26. Principal Lawson made clear that the reimbursement denial was "based on the instructional content of the materials" and that reimbursement could be approved if there were a "version[] of the[] curriculum that remove[d] religious instruction." *Id.* ¶ 140. And the Assistant Superintendent reiterated that the District would reimburse similar curricula that did not "embed[] religious perspectives into the curriculum materials"

and "in which religious instruction is not part of the curriculum itself." *Id.* ¶¶ 142, 161.

Defendants plan to continue enforcing that policy. The HSDHP website states at least three times that the curriculum allowance can be used for "non-religious" curriculum and extracurricular activities. *Id.* ¶ 186. At this year's orientation for HSDHP, administrators emphasized that parents could "use [their] curriculum allowance on (secular) non-religious homeschool curriculum, school supplies, and extracurriculars." *Id.* ¶ 187. And paperwork distributed to the families stated that "[c]urriculum funds **may not be used** to purchase or reimburse any materials, curriculum, classes, or activities that are **religious in nature**." *Id.* ¶ 193. Two of the curricula that were listed as ineligible for reimbursement were the ones Mrs. Bulzan used last year, and another one Mrs. Bulzan has purchased to use this school year. *Id.* ¶ 195. The paper stated: "**items [could] not be submitted for reimbursement or purchase using program funds**." *Id.* ¶ 196. And it threatened "**removal from the Homeschool Partnership Program … at the discretion of HP staff and administration**" if those items were submitted. *Id.* ¶ 199.

In short, Defendants offered a public benefit to homeschooling families. But they then denied Mrs. Bulzan that benefit when she sought to use it on her chosen homeschooling materials—solely because those materials were from a religious perspective. Defendants cannot force people of faith "to choose between the exercise of a First Amendment right and participation in an otherwise available public program." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981). That "effectively penalizes the free exercise of religion," is "odious to our Constitution,"

and "must be subjected to 'the strictest scrutiny.'" *Carson*, 596 U.S. at 780 (quoting *Espinoza*, 591 U.S. at 484).

**2. Defendants' actions trigger strict scrutiny because they substantially interfere with Mrs. Bulzan's right to direct the religious upbringing of her children.**

Defendants also violate Mrs. Bulzan's free-exercise rights by infringing on her right to direct the religious upbringing of her children. *Mahmoud*, 606 U.S. at 546; *see also Espinoza*, 591 U.S. at 486. "The practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection from our Constitution." *Mahmoud*, 606 U.S. at 547. The Free Exercise Clause protects not only against "direct coercion," but also "against policies that impose more subtle forms of interference with the religious upbringing of children." *Id.* at 548.

*Mahmoud* identified four principles for assessing whether the government has violated a parent's fundamental right to direct their children's religious upbringing. *First*, a school's policy burdens parents' free-exercise rights when it "pose[s] 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill." *Id.* at 530, 565 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 219 (1972)). *Second*, forcing parents to pay to avoid the burden was no answer. *Id.* at 561. *Third*, this right attaches even if the child is in public school. *Id.* at 547. And *fourth*, strict scrutiny was "appropriate regardless of whether the law is neutral or generally applicable" because of the "special character" of the burden on parents' religious development of their children. *Id.* at 565.

*First*, Defendants' actions and policy refusing to reimburse religious materials "pose[s] 'a very real threat of undermining' the religious beliefs and

practices" that Mrs. Bulzan "wishes to instill" in her children. *Mahmoud*, 606 U.S. at 556 (citing *Yoder*, 406 U.S. at 218). For Mrs. Bulzan, "there are few religious acts more important than the religious education of [her] children," and "the religious education of [her] children is not merely a preferred practice but rather a religious obligation." *Mahmoud*, 606 U.S. at 547 (citing *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 754–56 (2020)); *see* Compl. ¶¶ 202–18.

In other words, Mrs. Bulzan has "sincere religious beliefs" about her children's religious education, and she "feels a religious obligation to raise [her] children in accordance with those beliefs." *Mirabelli*, 607 U.S. at 496. By providing educational funding, but refusing to fund parent-chosen religious materials, Defendants burden Mrs. Bulzan's ability to teach her children as she feels religiously called to teach them. Worse, Defendants pressure Mrs. Bulzan to use non-religious materials: their policy "inevitably deters or discourages" people from using religious curricula. *Espinoza*, 591 U.S. at 478 (citations omitted).

Even a "subtle" interference is constitutionally problematic, *Mahmoud*, 606 U.S. at 548 (citing *Yoder,* 406 U.S. at 211), because "[t]he Free Exercise Clause of the First Amendment protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions," *Carson*, 596 U.S. at 778. Here, by "cutting [Mrs. Bulzan] off from otherwise available benefits" because she "cho[]se a religious [education] rather than a secular one, and for no other reason," Defendants "penalize[d] that decision" and substantially interfered with Mrs. Bulzan's religious upbringing of her children. *Espinoza*, 591 U.S. at 486.

*Second*, it is "no answer to [Mrs. Bulzan's] First Amendment objections" that she can still pay for her own materials written from a religious perspective. HSDHP's reimbursement is a public benefit, and "the government cannot 'condition'

its 'availability' on parents' willingness to accept a burden on their religious exercise." *Mahmoud*, 606 U.S. at 561 (quoting *Trinity Lutheran*, 582 U.S. at 462). Even with the HSDHP reimbursement, "[h]omeschooling comes with a hefty price." *Id.* at 562. Defendants' requirement that homeschool families strip religion from their instruction to receive limited financial support from HSDHP makes a potential substitute for traditional public-school education even more costly for religious families. *Id.* at 561–62. In addition, Mrs. Bulzan pays taxes to finance the public education, regardless of whether her children receive any benefit. *Id*. at 562. And school is compulsory in Oregon, meaning these are costs that Mrs. Bulzan cannot simply avoid. Or. Rev. Stat. § 339.010; *see Mahmoud*, 606 U.S. at 561. "It is both insulting and legally unsound to tell [Mrs. Bulzan] that she must abstain" from using the HSDHP reimbursement "in order to raise [her] children in [her] religious faith." *Id*. at 562.

*Third*, it does not matter whether the children that participate in HSDHP are classified as public-school students. Indeed, "many parents 'have no choice'" but to accept publicly funded education. *Id*. at 547. Thus, "the right of parents 'to direct the religious upbringing of their children would be an empty promise if it did not follow those children into the public school." *Id*. Even "in a public school setting," the Supreme Court has "recognized limits on the government's ability to interfere with a student's religious upbringing." *Id*. Moreover, "[p]ublic education is a public benefit." *Id*. at 561. So "the government cannot 'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise." *Id.* (quoting *Trinity Lutheran*, 582 U.S. at 462).

*Fourth*, the burden here is of the same character as *Yoder*—*i.e.*, Defendants' "polic[y] pose[s] 'a very real threat to undermining' the religious beliefs and

practices that [Mrs. Bulzan] wish[es] to instill in [her] children." *Id.* at 565. Thus, strict scrutiny applies without assessing whether the policy is neutral and generally applicable. *Mahmoud*, 606 U.S. at 564–65 (citing *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881 (1990); *Yoder*, 406 U.S. at 218.

#### 3. Defendants' actions trigger strict scrutiny because they are neither neutral nor generally applicable.

*Trinity Lutheran, Espinoza*, *Carson, Yoder,* and *Mahmoud* control here. In those cases, the Supreme Court declined to apply the neutral and generally applicable standard from *Smith*. Yet Defendants' actions trigger strict scrutiny even under *Smith*: they are neither neutral nor generally applicable. "Neutrality and general applicability are interrelated," and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993). Here, Defendants' policy fails both.

*Neutrality*. The Free Exercise Clause "forbids subtle departures from neutrality and covert suppression of particular religious beliefs" and "protects against governmental hostility which is masked, as well as overt." *Id*. The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Indeed, "laws that impose special disabilities on the basis of religious status" or "discriminate against some or all religious beliefs" are "not, in fact, neutral." *Trinity Lutheran*, 582 U.S. at 461 (cleaned up) (collecting cases). In other words, government actions or policies that "single out the religious for disfavored treatment" are not neutral. *Id*. at 460.

Defendants' refusal to reimburse Mrs. Bulzan's chosen curriculum and materials is not neutral. Defendants excluded the curriculum and materials because

of their "Christian and biblical worldview." Compl. ¶ 117. That is facially discriminatory. Government action that "single[s] out" religious practice for "discriminatory treatment" is never neutral. *Lukumi*, 508 U.S. at 538. As the Court put it in *Carson*, "there is nothing neutral" about "exclud[ing] some members of the community from an otherwise generally available public benefit because of their religious exercise." 596 U.S. at 781. That principle applies here.

What's more, Defendants' lack of neutrality is evidenced by their blatant hostility. For one, the District Assistant Superintendent chastised ODE for "sending [Mrs. Bulzan] detailed steps to launch a discrimination complaint" when Mrs. Bulzan contacted it. Compl. ¶ 153. Worse still, she also mentioned a rumor that another homeschool program was "reimbursing religious curriculum and materials" and asserted that she "truly hoped" that information was "not accurate." *Id.* ¶¶ 147–48. Moreover, every example of ineligible curriculum in Defendants' "agreement" is rooted in Christianity. *Id.* ¶ 194. Not one comes from any other religion. *Id.*

In short, like the program at issue in *Carson*, "there is nothing neutral about [HSDHP's] program." 596 U.S. at 781. Defendants reimburse for certain educational materials—"so long as the [materials] are not religious." *Id.* Indeed, Defendants stated that they would approve a "version" of Mrs. Bulzan's curricula if it "remove[d] religious instruction." Compl. ¶ 140. "That is discrimination against religion." *Carson*, 596 U.S. at 781. Defendants' actions and policies "single out the religious for disfavored treatment" and thus "trigger[] the most exacting scrutiny." *Trinity Lutheran*, 582 U.S. at 462 (citing *Lukumi*, 508 U.S. at 546). Actions, such as Defendants', that "target[] religious conduct for distinctive treatment . . . will

survive strict scrutiny only in rare cases." *Carson*, 596 U.S. at 780–81 (quoting *Lukumi*, 508 U.S. at 546). This is not one of those rare cases.

*General applicability*. Government action is not generally applicable if it "provid[es] a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533–34 (cleaned up). Put another way, the government fails general applicability when it can hand out "entirely discretionary exceptions" from the challenged rule or conduct. *Id*. at 536. And government action is "not neutral and generally applicable … whenever [it] treat[s] any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Defendants actions and policy fail on both counts.

To begin, Defendants expressly said they would allow versions of Mrs. Bulzan's curricula that removed religious references. Compl. ¶¶ 124–26, 140. That is treating secular curricula more favorably than religious ones and defeats general applicability.

In addition, each HSDHP reimbursement decision is discretionary. *Id.* ¶¶ 64, 95. Staff review the educational materials and curriculum on a "case-by-case basis" to determine whether they personally believe the material is too "religious." *Id.* ¶ 95. At one point, the HSDHP administrator even implied that faith-based curriculum "might" be reimbursable if it was not for Bible class and was instead predominantly academic. *Id*. Perhaps even more telling, Defendants' "agreement" itself confirms removal from HSDHP for attempting to seek reimbursement for faith-based materials "**is at the discretion of HP staff and administration.**" *Id*. ¶ 199. In other words, Defendants assert that they have full discretion to decide which materials count as too religious and then to expel any family that seeks reimbursement for those amorphous materials. That is not generally applicable.

Because the District's program is neither neutral nor generally applicable, strict scrutiny must apply.

**4. Defendants cannot survive strict scrutiny.**

Strict scrutiny applies three times over. And Defendants cannot meet that standard. *Carson* makes clear that Establishment Clause concerns—the only reason Defendants gave for their religious discrimination—does not satisfy strict scrutiny. Defendants' justification for denying Mrs. Bulzan the reimbursement benefit was only that doing so would "violate the Establishment Clause of the First Amendment or Article I, section 5, of the Oregon Constitution." Compl. ¶¶ 139, 255. But Defendants do not have any sufficient antiestablishment interest in curtailing religious, "independent choices of private benefit recipients" who are participating in "a neutral benefit program." *Carson*, 596 U.S. at 781 (citing *Zelman*, 536 U.S. at 652–53). Indeed, "[a] State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.* That is exactly what Defendants did here. Waving at the Establishment Clause or Oregon's equivalent cannot justify their religious discrimination, and Defendants have provided no other reason for excluding Mrs. Bulzan's chosen materials from the program. Because Defendants' actions and policy trigger and fail strict scrutiny, they violate Mrs. Bulzan's free-exercise rights and cannot stand.

**B. Mrs. Bulzan is likely to succeed on her Fourteenth Amendment parental-rights claim.**

The Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Among these fundamental

rights and liberty interests is "the [liberty] interest of parents in the care, custody, and control of their children"—"perhaps the oldest of the fundamental liberty interests recognized" by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). Indeed, the Court's "long-established precedent" confirms the right, emphasizing that "parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli*, 607 U.S. at 497 (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925)) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923)).

This fundamental right "without doubt" includes the right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer*, 262 U.S. at 399, 401. "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 232. Thus, the government may not condition a government benefit on a parent giving up her right to direct her child's upbringing. *E.g.*, *Mahmoud*, 606 U.S. at 530, 561; *cf. Koontz v. St.Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("[T]he government may not deny a benefit to a person because he exercises a constitutional right.") (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 545 (1983)). Here, Defendants did just that. Mrs. Bulzan has a constitutional right to direct her children's education and upbringing. That right includes the right to homeschool, and specifically to use religious instruction in her homeschool. *Pierce*, 268 U.S. at 534–35; *Yoder*, 406 U.S. at 218–19. Defendants infringed on that right when they required Mrs. Bulzan to forgo religious educational materials to receive the reimbursement benefit.

That condition imposes a real burden on her parental right through a financial penalty. And it is "long ... established that a State may not impose a

penalty upon those who exercise a right guaranteed by the Constitution." *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) (citing *Frost & Frost Trucking Co. v. R.R. Comm'n of Cal.*, 271 U.S. 583 (1926)). For instance, in *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Supreme Court considered a law that penalized residents for exercising their constitutional right to travel—another unenumerated right. 405 U.S. at 338–39. That the right to travel was "merely penalized" instead of "absolutely denied" did not matter for constitutional purposes. *Id.* at 341. Even an unenumerated right could not be "indirectly denied." *Id.* (quoting *Harman*, 380 U.S. at 540); *see also Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 269 (1974) (unconstitutional to condition generally available medical care benefit on burden to right to travel).

Defendants chose to fund home education and then carved out the curricular choices Mrs. Bulzan's faith requires. Their policy imposes a Hobson's choice: use the government's preferred content or forfeit a public benefit that every other participating family receives. And the Supreme Court has "repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013) (citing *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194 (2003); *Wieman v. Updegraff*, 344 U.S. 183, 191 (1952)). By financially penalizing Mrs. Bulzan's choice of otherwise eligible curricula, the policy "interferes with the opportunities of pupils to acquire knowledge, and with the power of parents to control the education of their own." *Meyer*, 262 U.S. at 401. It "coerce[s]" her to change her children's education "by methods which conflict with the Constitution." *Id.* Pressuring parents to abandon their constitutional rights via financial penalties cannot stand.

Strict scrutiny applies to Defendants' violation of Mrs. Bulzan's fundamental rights to direct the upbringing and education of her children. *Mirabelli*, 607 U.S. at 496–97. Defendants point only to an antiestablishment interest as justification for violating Mrs. Bulzan's right to direct her children's upbringing. Compl. ¶¶ 139, 255. But as explained above, *supra* Section I.A, antiestablishment interests cannot justify curtailing religious, "independent choices of private benefit recipients" who are participating in "a neutral benefit program." *Carson*, 596 U.S. at 781 (citing *Zelman*, 536 U.S. at 652–53). And it is no defense to tell Mrs. Bulzan she is free to use religious materials—so long as she pays for them herself. "It is both insulting and legally unsound to tell" a parent that she "must abstain" from a public benefit "in order to raise her children in her religious faith." *Mahmoud*, 606 U.S. at 562.

**C. Mrs. Bulzan is likely to succeed on her free-speech claim.**

Defendants also violate Mrs. Bulzan's free-speech rights in two ways. One, Defendants "restrain[ ] ... the way" that Mrs. Bulzan can speak. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (collecting cases). Two, Defendants engage in unconstitutional viewpoint discrimination.

To begin, educational speech "is speech protected by the First Amendment." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020). And that applies to homeschool instruction. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 636 (1984) (O'Connor, J., concurring) ("[P]rotected expression may also take the form of ... instruction of the young."). Indeed, "[a] teacher's teaching is expression to which the First Amendment applies." *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003) (quoting *Wilson v. Chancellor*, 418 F.Supp. 1358, 1362

(D.Or. 1976)). So Mrs. Bulzan's homeschool instruction is private speech, which the First Amendment protects.

The availability of limited public funding does not transform Mrs. Bulzan's private, homeschool instruction into government speech. Mrs. Bulzan chooses her homeschool instruction; she chooses religious instruction; and she teaches it to her children in her own home. Defendants explicitly allow her to use her chosen religious instruction as part of the homeschooling program. This is not government speech even though Mrs. Bulzan participates in Defendants' homeschooling program. *Contra Woolard*, 170 F.4th at 710.

In fact, HSDHP is a limited public forum on all fours with the one the Supreme Court considered in *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995). HSDHP, like the University in *Rosenberger*, "expends funds to encourage a diversity of views from private speakers." 515 U.S. at 834. The District's own website explains that HSDHP exists "to empower families in creating personalized, meaningful education." Compl. ¶ 55. Like *Rosenberger*, the HSDHP forum is a "metaphysical" forum because it involves "the provision of funds." 515 U.S. at 830, 832. And like *Rosenberger*, HSDHP does not "enlist[ ] private entities to convey its own message." *Id.* at 833. Instead, it allows families "the freedom to use [their] homeschool curriculum materials to provide individualized, parent-taught academic instruction at home." Compl. ¶ 56. Families are free in "what choices they use for curriculum" and may use "religious curriculum" and other materials based on their "religious beliefs." *Id.* ¶¶ 60, 62–63. Thus, as in *Rosenberger*, HSDHP funds private speech; it does not subsidize government speech. 515 U.S. at 834 (collecting cases).

Funding private speech does not give Defendants the right to violate the Free Speech Clause. But Defendants do so in two ways.

*First*, Defendants put "restraints on the way" that Mrs. Bulzan can speak by refusing to provide otherwise available funds for that speech; that implicates—and violates—the First Amendment right to free speech. *Sorrell*, 564 U.S. at 568 (collecting cases).

*Second*, Defendants engage in unconstitutional viewpoint discrimination. Defendants permissibly limit HSDHP's funding to certain categories of speech, namely educational expenditures. *Rosenberger*, 515 U.S. at 829–30. That makes sense: the purpose of the program is to "empower families in creating personalized, meaningful education." Compl. ¶ 55. After creating those limits, the Constitution forbids Defendants from engaging in viewpoint discrimination "against speech otherwise within the forum's limitations." *Rosenberger*, 515 U.S. at 830 (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983)). But Defendants do just that.

Defendants' policy specifically excludes any religious educational instruction, including, for example, the Abeka and Classical Conversations curricula. Those curricula are academically excellent and thus further "the purpose served by the forum" and are "otherwise within the forum's limitations." *Id.* In fact, Defendants were clear that they excluded Mrs. Bulzan's religious speech solely because of its religious viewpoint. Compl. ¶¶ 93–177.

Underscoring Defendants' religious discrimination, Defendants fund comparable non-religious speech. For example, the District told Mrs. Bulzan that they would fund a "version" of her curricula that removed the religious perspective. *Id.* ¶ 140. It also told her that if she could find a "secular cursive curriculum similar

to Abeka," it would reimburse that curriculum. *Id.* ¶¶ 124–26. That makes clear that the *content* of Mrs. Bulzan's speech—cursive instruction—is acceptable; only the *viewpoint*—religious—is prohibited. That is viewpoint discrimination and "presumed impermissible." *Rosenberger*, 515 U.S. at 830 (citation omitted). Moreover, Defendants fund a wide range of other worldviews, many of them antithetical to Christianity. For example, Defendants allowed reimbursement for a book about a young boy who dresses in drag as a mermaid. Compl. ¶¶ 84–86.

Thus, Defendants' policy "discriminates on the basis of viewpoint" because it supports "the presentation of all views" except those "from a religious standpoint." *Lamb's Chapel v. Ctr. Moriches Union Sch. Dist.*, 508 U.S. 384, 393 (1993). That is unconstitutional: "government must abstain" from disadvantaging certain speech where, as here, "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829 (citing *Perry Educ. Ass'n*, 460 U.S. at 46). And denying "funding" to certain viewpoints is "viewpoint discrimination." *Id.* at 830–31. In short, Defendants cannot withhold otherwise available funding from Mrs. Bulzan's religious speech—because it is religious—when Defendants fund comparable non-religious speech. *Id.* at 834–37. Doing so is viewpoint discrimination—an "egregious" affront to the First Amendment, even if the forum is of the school's "own creation." *Id.* at 829. That discrimination is subject to strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 168, 171 (2015).

Defendants' actions cannot withstand any level of scrutiny and certainly not strict scrutiny. To satisfy strict scrutiny, Defendants must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest," *id.* at 171 (citation omitted). The only interest Defendants voiced was

Establishment Clause concerns. Compl. ¶¶ 139, 255. But the Supreme Court has been clear: "[t]here is no Establishment Clause violation in the [District] honoring its duties under the Free Speech Clause." *Rosenberger*, 515 U.S. at 846. Thus, antiestablishment concerns cannot be a legitimate, let alone compelling, interest. By excluding Mrs. Bulzan's speech from HSDHP's funding, Defendants violate her free-speech rights.

## II. Mrs. Bulzan satisfies the other preliminary injunction factors.

In First Amendment cases like this, Mrs. Bulzan's likelihood of success on even one of her claims is "determinative," and the Court may "confine [its] analysis to that factor." *Mobilize the Message*, 50 F.4th at 934 (citation omitted). But the remaining preliminary injunction factors—irreparable harm, balance of equities, and public interest—also all favor an injunction.

***Irreparable Harm.*** "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud*, 606 U.S. at 569; *see Mirabelli,* 607 U.S. at 497. Each day that passes where Defendants refuse to reimburse Mrs. Bulzan's religious materials constitutes irreparable harm.

Making matters worse, Mrs. Bulzan risks losing all potential avenues for reimbursement without clarity on what the Defendants—in their sole discretion—will deem religious. Defendants have threatened to eject families from HSDHP "**at the[ir] discretion**" if a family seeks reimbursement for materials that are (in Defendants' opinion) "**religious in nature**." Compl. ¶¶ 193–99. What Defendants consider religious shifted last year, leaving Mrs. Bulzan with little guidance on what she can submit. *Compare id.* ¶¶ 94–95 with *id*. ¶¶ 192–96. That threat and uncertainty has forced Mrs. Bulzan to refrain from submitting receipts for curricula

that Defendants have labeled or even might label religious. Decl., Ex. A (Receipts for curricula and materials Mrs. Bulzan would submit for reimbursement). This harm is compounded because HSDHP did not threaten to expel families until after the deadline had closed for other homeschool programs. *Id.* ¶ 199. So if Mrs. Bulzan is removed from the program, she cannot receive any other reimbursement or participate in other programs' in-person opportunities.

That uncertainty and looming threat matter. Whether Defendants reimburse Mrs. Bulzan impacts the educational opportunities her children receive this school year. And those missed opportunities are experiences and education that her children can never make up. Defendants' violation of Mrs. Bulzan's First and Fourteenth Amendment rights is irreparably harming her and her children.

***Balance of Equities and Public Interest.*** The balance of equities and public interest also tip heavily in Mrs. Bulzan's favor. "When the government is a party, these last two factors [of the injunction analysis] merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418 (2009)). It is "always in the public interest to prevent the violation of a party's constitutional rights." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citations omitted). And because Mrs. Bulzan has "raised serious First Amendment questions," that "alone compels a finding that the balance of hardships tips sharply in [her] favor." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023).

An injunction would not harm Defendants. The only interest Defendants have raised is not violating the Establishment Clause. But as the Supreme Court has clarified, that "antiestablishment interest" is insufficient. *Carson*, 596 U.S. at

781. And Defendants cannot be harmed by respecting Mrs. Bulzan's First Amendment rights.

## CONCLUSION

For these reasons, the Court should grant the motion and issue the requested preliminary injunction.

Respectfully submitted this 12th day of October, 2026.

/s/ *Kelsey Catina*

Rebekah Schultheiss
OR Bar No. 121199
LAW OFFICES OF REBEKAH MILLARD, LLC
P.O. Box 7582
Springfield, Oregon 97475
(707) 227-2401
rebekah@millardoffices.com

Katherine L. Anderson*
AZ Bar No. 33104
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
kanderson@ADFlegal.org

Kelsey C. Catina*
WA Bar No. 63116
Payton C. Tompkins*
WA Bar No. 61724
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 202-5662
kcatina@ADFlegal.org
ptompkins@ADFlegal.org

David A. Cortman*
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

*Counsel for Plaintiff*
**Admitted Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains **9,281** words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ *Kelsey C. Catina*
Kelsey C. Catina
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

Pursuant to the Fed. R. Civ. P. 5(b)(2)(E), I hereby certify that on the 12th day of October, 2026, a true copy of the foregoing was emailed to:

Beth Plass
VICKERS PASS LLC
5200 Meadows Road
Suite 150
Lake Oswego, Oregon 97035
bplass@vickersplass.com
*Counsel for Defendants*

/s/ *Kelsey C. Catina*
Kelsey C. Catina
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
*Counsel for Plaintiff*